### C. J. KIERNAN v. THE STATE.

#### No. 4747.   Decided January 29, 1919.

#### Murder—Insanity—Insufficiency of the Evidence.

· Where defendant was convicted of the murder of his son, and the record on appeal showed that the verdict was clearly against the overwhelming weight and preponderance of the evidence, and the defendant was insane at the time of the alleged offense the judgment is reversed and the cause remanded.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of murder; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*Cobbs & Cobbs* and *Wm. C. Church,* for appellant.—On question of insanity: Belcher v. State, 161 S. W. Rep., 459; Mansell v. State, 182 S. W. Rep., 1137; Shaffer v. State, 151 S. W. Rep., 1061; Montgomery

v. State, 151 S. W. Rep., 813; Maxey v. State, 145 S. W. Rep., 952; Leache v. State, 3 S. W. Rep., 544.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of insanity: Webb v. State, 9 Texas Crim. App., 490; Hurst v. State, 40 Texas Crim. Rep., 378; Welch v. State, 157 S. W. Rep., 946.

LATTIMORE, Judge.—Appellant was charged with murder of his twenty-year-old son, and this is his second appeal. (See 80 Texas Crim. Rep., 303.) The killing was done with a pistol and occurred at the home of appellant and deceased in the afternoon. No one testified as an eyewitness to the killing, but it is made clear from the record that appellant had armed himself with a pistol and had sent word to his son not to come home on the fatal afternoon, that if he did he would be killed, but deceased did come and when the two met in the house the son was shot, dying instantly.

The only cause for such conduct on the part of appellant appears from the testimony of his wife, who was the mother of deceased. After testifying to the condition of her husband's mind and health for years, and many of his acts and words, and that he was subject increasingly to what she called "spells," she said:

"The morning of the trouble I called John to breakfast, I always get up and get breakfast myself, I called John first because he had to go out first, I didn't call Mr. Kiernan, I called John first and had his breakfast on the table. As I put his lunch up, he always carried lunch to work. When I put his lunch up I took a cup of coffee and went to the front gallery and sat down there, in the meantime his father had gotten up and gone to the bathroom. After calling John to breakfast I went back to the kitchen and put up his lunch, put up John's lunch, then I put breakfast on the table for the family so they could get in and eat when they got ready. After getting breakfast on the table and John's lunch put I took a cup of coffee and went on the front gallery, as I usually do in the morning because I never eat early breakfast. I was sitting out there, I wasn't thinking any more about it, I knew the father was up and the boys getting ready to go to work, and the other members of the family also getting up. The first thing I knew John came out of the house and I noticed when he came out he was a little excited. Mr. Kiernan told me John was trying to run the house and he wouldn't have it that way, something about slamming the door— that afternoon Mr. Kiernan came back home late. He did not come to dinner that day. It must have been about 5 o'clock when he got home. He came to the back door with a pistol in his hand and told me if I didn't want a tragedy there not to let John come home that evening. I told him I had sent him word not to come by his sister and brother, but I would go and call him myself. I had no telephone in the house at the time. I went to a drug store down below the house and telephoned John not to come home. I told him that Mr. Kiernan had a pistol and

I insisted that he not come home.  He first said he would come, then
I told him what trouble it might lead to, and he said: 'What shall
I do?'  I says: 'I don't know, John, wait until tomorrow anyway until
your father gets this spell off, I think then you can come back.'  I also
said: 'Go ask some officer, they can give you advice better than I do.
Don't by any means come home, but if you should come, come in the
back way.'  He said: 'I can't come in the back way.'  I said: 'Mr.
Heffner will let you come in his back lot.'  He said: 'All right, mamma,
I will not give you any trouble, I will do as you say.'  That led me
to believe he would not come home.  I stayed on the back gallery to
watch for him, I thought if he came that way I would see him and send
him back if I could see him before he got in.  Mr. Kiernan's condition
was extremely nervous at that time, he had very little to say and had
absolutely no control over himself.  I put some supper on the table and
called the children and father in to supper.  The babies came in and the
father would not eat anything, came and sat in the dining room door
and talked to me.  I remained on the back gallery and the babies were
eating their supper, and Mr. Kiernan was talking to me through the
screen door, through the dining room leading to the back gallery.  He
turned and walked into the room.  I don't know what happened.  I
heard the pistol fired is all I can say."

No other witness gave any testimony as to the cause or motive for
the difficulty.  It was not contended by counsel for the appellant on
the trial that he did not do the shooting and apparently the "only de-
fense was that of insanity."  The brother, daughter and wife of appel-
lant testified to many acts of his extending over a period of many years
showing that his mind was unsound and leading them to the conclusion
that he was insane, as each of them testified he was at the time.  James
Young and Thomas L. Conroy, who had known appellant for years, de-
tailed his conduct and swore that in their judgment he was insane.  Five
reputable physicians, including Dr. Francis White of the Southwestern
Insane Asylum staff, testified that appellant was insane, one or more
of them stating that on a former trial they had testified that they be-
lieved him sane, but had changed their minds since.  The only other
witnesses introduced were as to facts immediately attendant upon the
killing, or just before or after same, and none of them were asked as to
appellant's mental condition.  The State did not put on a witness to
prove the sanity of appellant, nor any witness to impeach any of the
defense's witnesses who swore appellant was insane.  The statement of
facts was prepared by the trial court, who certified that the attorneys
for the respective parties had failed and been unable to agree thereon,
and we are sure it is a fair statement.

We are loath to disturb the case on the finding on the facts and do not
believe we should do so in cases where there is merely conflict of testi-
mony, but when we are convinced that the verdict is clearly against the
overwhelming weight and preponderance of the testimony we do not feel
at liberty to close our eyes to that fact out of deference to the verdict

of the jury.  The unnatural and horrible character of this man's act, killing his own son, apparently without provocation worthy of the name, as disclosed by the record, should call for the closest scrutiny of his mental condition before he should be convicted.  Our merciful and just law makes it a necessary condition precedent to guilt that the act must have been that of a sane man and not that of one irresponsible, and when all the witnesses on that point, and they are numerous and apparently credible, agree as to the fact of appellant's insanity and there is absolutely no contradiction of that fact in the record we can not allow the conviction to stand.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*