Jose Zubia PACHECO, Appellant,

v.

The STATE of Texas, Appellee.

No. 078–85.

Court of Criminal Appeals of Texas,
En Banc.

June 8, 1988.

Rehearing Denied Sept. 21, 1988.

David C. Guaderrama, El Paso, for appellant.

Steve W. Simmons, Dist. Atty. and Robert Dinsmoor and Matthew Dekoatz, Asst. Dist. Attys., El Paso, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant was convicted of burglary of habitation; punishment was assessed at confinement for five years. The Court of Appeals affirmed the judgment of conviction in an unpublished opinion. *Pacheco v. State* (Tex.App.—El Paso No. 08–84–00131–CR, delivered October 24, 1984).[1]

---

1. The State belatedly contends in its brief that we should dismiss the appellant's petition for discretionary review (PDR) because, as the State calculates the time, it was not timely filed. The El Paso Court of Appeals overruled appellant's motion for rehearing on November 21, 1984, and the State says the last day for filing PDR was December 21, 1984. We do not agree with its analysis of our Rules of Post Trial and Appellate Procedure then applicable.

Former rule 304(b) provided a PDR must be filed "within 30 days after the final ruling of the court of appeals." Here the "final ruling" is "the day after the date of overruling of [the] motion for rehearing," rule 209(c), specifically November 22. According to rule 7, however (which the State seems to have overlooked), "*the day of the act [or] event....* after which the designated period of time begins to run is *not* to be included." (Emphasis added here and throughout by the writer of this opinion unless

Appellant followed the proper procedures prescribed by Article 46.03, § 2, V.A.C. C.P., by timely filing notice of his intention to offer evidence of the insanity defense. At trial, after all evidence was concluded and during a conference on the jury charge appellant contended the evidence was sufficient to raise the insanity defense. However, the trial court did not submit it.[2]

The issue thus presented is the character and quality of evidence sufficient to support the insanity defense for determination by a jury under appropriate instructions.

## I

### Testimony

While there is more, as we will see, some evidence upon which he relies is undisputed testimony of complainant whose residence appellant entered, and of her sister. Testifying through an interpreter, together they related what appellant did and said around noon of a Sunday in January in El Paso.

The complaining witness (Ramos) was home alone when she heard the doorbell ring. She looked out a window and saw an outer "iron door" was open; intending to close it, she opened the front "wooden door," only to see appellant standing there. Appellant showed her a little "wallet" or "glass case," but she indicated with her head or said "no." "Like he was scared," with the wallet in his hand appellant "hit" complainant "here," and with his body pushed the wooden door open. "(indicating)." [3] As appellant brushed past her and went on inside, Ramos ran away from her house; appellant closed the door behind

him and locked it. Ramos saw her sister (Nunez) and daughter coming toward the house and hurried to tell Nunez what had happened. Ramos then went to another house to find a telephone; her sister called out to her daughter to look for a telephone and call the police. The sister remained near the front of the house.

In the kitchen was a coffee maker. Shortly, appellant came out of the house with the coffee maker in his hand, throwing and spilling hot coffee from it. Nunez heard him say, "[T]hat was his house." She replied, "[S]ir, please get out because that is not your house." Appellant told her, "[N]o, no one can do anything to me because I have God. God takes care of me in my house and no one can do anything for me. God takes care of me and also the Virgin." Appellant showed Nunez a "stamp," and then went back inside the house and closed the door.

In her bedroom on top of a "machine" Ramos kept rosaries in a small wooden box that the court reporter labeled a "jewelry box;" there was a likeness of Christ on it. All items in the box were "of religious nature."

In five or ten minutes appellant came out of the house with the box. Indicating to Nunez that it was his box, saying such as "I have my rosary," and "God was taking care of him because he was carrying that," he walked across the street to a nearby park, bordered at that point by a structure both witnesses called "pillars," and the arresting officer described as a "cement or brick wall" about five feet high.

otherwise indicated.) Thus, the first date of the prescribed 30 day period is November 23; the thirtieth day is December 22, 1984, a Saturday. Under rule 7 the period ran until the end of the following Monday, December 24. However, the record reflects that while December 24 and 26 were not legal holidays within the meaning of Article 4591, R.C.S., the office of the clerk of the El Paso Court of Appeals was closed those days, making it impossible for appellant to file his PDR. In these circumstances, we will consider it timely filed.

**2.** After both parties closed, the judge of the trial court permitted appellant to object to the proposed charge to the jury, *inter alia,* for the reason that it did not contain instructions of the insanity defense, and also granted him leave to

file written requested instructions properly authorizing the jury to acquit appellant by reason of insanity. The court overruled his objection and refused to submit his requested instructions.

**3.** We have no other hint from this witness where "here" is. When she was later asked about any injury, the record reflects complainant answered, "Well, when he pushed me, his hand, with the little wallet that he had, he went like this to me here and the next day there was a small bruise there. (Indicating)" The arresting officer testified, "On her right arm, there was a red area that looked, possibly, like it had been scratched."

Appellant climbed up and stood on top of the structure, "showing the rosaries and some stamps." Soon Officer Clay William Gibson arrived on the scene. He saw appellant with the wooden box in his hand, and told him to climb down off the wall. Appellant said, "No," and "just stayed up there." Officer Gibson then told him if he did not come down, "I would have to climb up on the wall and bring him down." Gibson testified that "after a little more coaching he did come down when I started to go up after him." He arrested appellant, took "the property, which was in his hand, from him," searched him, seized from his pocket such items as rings and a little chain, and placed him in the police car.

It is undisputed and conceded by complainant Ramos that the only property taken from her house by appellant is the small wooden box containing rosaries.

During cross examination of Nunez, complainant's sister, appellant drew from her the following testimony.

Q. Did there seem to be any apparent reason for that behavior?

A. I believe he is not very well, I don't know if he was drunk or drugged, but he was not very well.

Q. Could his behavior have been the result of mental disease?

MR. MARTINEZ: I'm going to object, that calls for speculation.

THE COURT: Sustained.

Q. Ms. Nunez, tell the jury what behavior you found strange on his part?

A. The way he was acting I believe he was either drunk or he was a drug addict or that he was not right in his mind.

Q. Thank you. Would you tell the jury how you formed the opinion that he was not right in his mind or that he was drugged or that he was intoxicated?

A. I believe that the way he was acting, the way he was spilling the coffee and the way he would say this is my house and would not run. He would show this and he would say, God takes care of me in my house and no one can do anything for me. God takes care of

me and also the Virgin. I believe that because other people that do things like that, what they might do is run or maybe beat you up.

The complaining witness also testified in similar vein on cross-examination.

Q. And, did you tell me that you had an opinion as to the sanity of the person who entered your house on that day?

A. Yes. It's that you told me—if I told him, because of the things that he did, that coming out with a coffee pot, well, we just thought that he was just not right.

Q. You didn't think he was intoxicated, did you?

A. Well, no. After they called him for him to come down and he tells them everything, the detective told me that he had declared that he would get epileptic attacks so that's why I thought, at that time, at that moment, he was not right.

\* \* \* \* \* \*

Q. So, based on the observation that you had of him, is it your opinion that he didn't know what he was doing?

A. Well, I believe so because, a normal person, they don't do these things. I don't know.

### Other Evidence

On the third day after his arrest a statement was taken from appellant in Spanish, but reduced to writing in English. Appellant gives a residence address in Juarez, Mexico, and his age as 31. In pertinent part the statement recites:

"Last Sunday, I do not remember the date or the exact time, but I think it was around noon, I went to [address of complainant] looking for friend named Victor. I rang the door bell and a lady answered the door. Without any reason, the lady took off running scared.... I do not remember if I went into the lady's house but it is very possible that I did. I would like to change what I just said on the previous sentence and say that I did go into the lady's house, but I did take anything [sic]."

Appellant timely filed an application for probation, and at the punishment phase appellant proved by the custodian of records of the El Paso Police Department that "after a diligent search," he did not find "the existence of any record or entry of a felony conviction for the violation of any law of the State of Texas, of any other state in the United States, or of the United States [for appellant]." The trial court charged the jury accordingly, but it declined to recommend probation. However, handprinted below the completed verdict on punishment appears the following:

"Additionally, this Jury strongly (recommends) urges that the defendant, Jose Zubia Pacheco, receive Medical and Professional Counseling." [4]

## II

### Opinion Below

To overrule his asserted error in refusal of trial court to charge the jury on the issue of insanity, the El Paso Court of Appeals noticed the provision of Article 46.03, § 1(a) (submitted only if supported by competent evidence) and elements of the defense contained in the extant definition of insanity in V.T.C.A. Penal Code, § 8.01 (Vernon 1974), and then engaged in a brief analysis, *viz:*

"While it is recognized that lay testimony is competent evidence on the issue of insanity, *Graham v. State,* 566 S.W.2d 941, 950 (Tex.Cr.App.1978), there is just not enough evidence in the present case to support a finding of the above elements. *There was no expert testimony.* The only evidence presented outside of

the facts surrounding the offense was that the complaining witness and her sister thought the Appellant was not in his right mind. There was also evidence that the Appellant kept saying the house was his. This evidence is not enough to show a mental disease or defect."

### Contesting Contentions

In this Court appellant contends testimony of lay witnesses is sufficient to raise the defense of insanity and, contrary to the courts below, that medical testimony regarding a mental disease or defect is not required to support it. He relies primarily on *Graham v. State,* 566 S.W.2d 941 (Tex. Cr.App.1978).

In its brief before this Court the State addresses the issue of "lay witness testimony vs. medical testimony." It asks whether lay testimony alone will provide "the evidence needed on the issue of insanity." The State argues:

"Such evidence of mental disease and especially causation are not generally known to average people. *Some expertise is required.* The situation would be rare in which the lay person's testimony would be sufficient to prove mental disease or defect, lack of knowledge on the part of the defendant, and especially causation.

\*   \*   \*   \*   \*   \*

Absent an exaggerated case (which the instant case is not), the Court should be extremely reluctant to say that lay testimony alone is sufficient to support an

---

**4.** After the judge of the trial court discharged the jury, he read that recommendation aloud, remarked that the matter would be taken care of on initial screening at TDC, and then announced that he would proceed to sentence appellant. The court reporter noted: "(Whereupon the Defendant became loud and unruly making comments in Spanish.)" When the trial judge started again, the reporter made a similar notation. The judge ordered that appellant be handcuffed and gagged, and then recounted incidents during trial to the jury which are not otherwise revealed by the statement of facts:

"Let the record reflect that in Spanish this Defendant, throughout the trial, has been using profanities, which the Court understands.

The Court has warned this man several times that he would gag him if he continued."

The record does reveal that at the outset of a pretrial hearing on the day of trial the judge had the record reflect "that when the Bailiff of this Court ... went to get the prisoner ... he refused to change into other clothes and insisted in coming down to the Court dressed this way." At the close of that hearing the judge directed counsel for appellant to "advise your client that during the progress of this trial, there will be no outburst on his part, ... and, you can inform him that if he makes a commotion or rout in this Court that he will have a gag and straight jacket put on him, if necessary."

affirmative finding of insanity or to require a jury instruction [on] the same."

## III

■ The former penal code covered the matter of insanity in articles 34 and 35.[5] Following the common law, the rule in this state is that a lay witness may recount germane observations of an accused and give an opinion that accused is insane on account of some abnormality of mind. *Newchurch v. State,* 135 Tex.Cr.R. 619, 121 S.W.2d 998 (1938) (On Motion for Rehearing, at 1001), quoting approvingly from *Thomas v. State,* 98 Tex.Cr.R. 428, 266 S.W. 147, 148–149 (1924); *Plummer v. State,* 86 Tex.Cr.R. 487, 218 S.W. 499 (1920) (On Motion for Rehearing, at 501–503), and cases cited at annotation to former article 35, supra, No. 7. Opinion evidence—Nonexperts, and at 1 Branch's Annotated Penal Code (2d Ed.) 41, § 51. Proof of Insanity, at 44.

■ Qualified lay persons are permitted to testify because "mental deficiency or derangement, though it may constitute a form of insanity known to and recognized by medical science, does not excuse one for crime." *Fuller v. State,* 423 S.W.2d 924 (Tex.Cr.App.1968). Under the M'Naghten Rule as construed in this state "the distinction between medical and legal insanity" has been maintained, *viz:*

"From a medical standpoint, one may be insane by reason of mental defect or mania, yet, from a legal aspect, not unless or until his mental condition has reached the point where he is unable to distinguish right from wrong and to know the nature and consequences of his acts is he exonerated or excused from crime committed while in that condition."

*McGee v. State,* 155 Tex.Cr.R. 639, 238 S.W.2d 707, at 710 (1950). Thus an accused is not responsible for his crime if he does not possess "the capacity ... to distinguish right from wrong in respect to the act charged as a crime at the time of its com-

mission and the probable consequences of his act"—the "right and wrong test." *Ross v. State,* 153 Tex.Cr.R. 312, 220 S.W. 2d 137 (1949) (Motion for Rehearing, at 144). From stated observations of an accused, his attitude, both mental and physical, as compared to his previous attitude in those respects, a nonexpert may draw his *"general conclusion or opinion"* as to what was sometimes called "general insanity," and present it in aid and assistance to a jury in applying the test. *Id.,* at 147.

When thus raised by evidence under the former penal code the jury charge on insanity was couched in terms of the M'Naghten Rule, i.e., "laboring under such defect of reasoning, from disease of mind, as not to know the nature and quality and consequence of the act he was doing [et cetera]." *Freeman v. State,* 166 Tex.Cr.R. 626, 317 S.W.2d 726, 730 (1958); *Parsons v. State,* 160 Tex.Cr.R. 387, 271 S.W.2d 643, 654 (1953); 1 *Branch's,* op cit., at 50, § 59.5 Form of charge: insanity, at 51; Practice Commentary following V.T.C.A. Penal Code, § 8.01.

■ Properly admitted opinion testimony of lay witnesses is sufficient to support a finding of insanity. See, e.g., *Wenck v. State,* 156 Tex.Cr.R. 50, 238 S.W.2d 793 (1951); *Gardner v. State,* 85 Tex.Cr.R. 103, 210 S.W. 694 (1919); *Kierman v. State,* 84 Tex.Cr.R. 500, 208 S.W. 518 (1919). Therefore, when medical experts testify that accused is afflicted with a specific disease of mind that produced insanity, a charge restricting the defense to that particular form of insanity is incorrect; it would detract from testimony of nonexpert witnesses who express an opinion on the question of general insanity or sanity, for the latter could not know or testify that accused was so laboring under a named disease of mind. *Parsons v. State,* supra, 271 S.W.2d at 654; *Freeman v. State,* supra, 317 S.W.2d at 730.

Thus as matters stood prior to January 1, 1974, qualified nonexpert testimony proper-

---

**5.** Together they provided in pertinent part: "No act done in a state of insanity can be punished as an offense," and "rules of evidence known to the common law as to the proof of insanity shall be observed ... where that question is an issue." That embraces essence of the M'Naghten rule. See *McCarter v. State,* 527 S.W.2d 296, 300, n. 2 (Tex.Cr.App.1975).

ly presented was competent evidence of insanity and, when admitted by a trial court and submitted to a jury by a correct charge, was sufficient to support a finding of insanity. See generally *Fuller v. State*, 423 S.W.2d 924 (Tex.Cr.App.1968) and Ray, Texas Law of Evidence § 1421, 2 Texas Practice 54. It was not then necessary that there be "medical testimony regarding a mental disease or defect before the insanity defense is raised.". Has the Legislature now made it so?

Section 8.01 is taken in part from Section 4.01, ALI Model Penal Code (1962), reproduced in the margin.[6] The Practice Commentary following V.T.C.A. Penal Code, 8.01, opines that "the Model Penal Code test and its variations are leading the trend away from *M'Naghten* [,]" and summarizes shortcomings of the latter. It is said that the rules "fail to aid in the identification of many persons accused of crime who suffer from serious mental disorders," one reason being that they "exclude mental defectives altogether and focus on but one of the major aspects of personality, the cognitive or intellectual faculty."

An initial observation at the outset is that neither § 4.01 or any related provision of the Model Penal Code purport to define "mental disease or defect." Surely the terms do not differ in substance from the M'Naghten formulation of "defect of reason, from disease of mind," as construed in decisions of the Court and applied in jury charges and otherwise. See *ante*. Indeed, the ALI Comment to § 4.01 concedes that "[a]s far as its principle extends, the M'Naghten rule is right," but contends that in other aspects it does not go far enough. Part I, Model Penal Code and Commentaries (American Law Institute 1985) 166.

In justification of the language underscored in note 3, ante, the Comment to

§ 4.01 explains its rationale, first with respect to "substantial capacity," viz:

"In contrast to the M'Naghten and 'irresistible impulse' criteria, the Model Code formulation reflects the judgment that no test is workable that calls for complete impairment of ability to know or to control. The extremity of these conceptions had posed the greatest difficulty for the administration of the old standards. * * * To meet these [perceived difficulties in administering old standards], it was thought that the criterion should ask if the defendant, as a result of mental disease or defect, was deprived of 'substantial capacity' to appreciate the criminality (or wrongfulness) of his conduct or to conform his conduct to the requirements of the law, meaning by 'substantial' a capacity of some appreciable magnitude when measured by the standard of humanity in general, as opposed to the reduction of capacity to the vagrant and trivial dimensions characteristic of the most sever afflictions of the mind."

*Id.*, at 171–172.

After critiquing the "knowledge" requirement of M'Naghten and finding it wanting in at least two particulars, *id.*, at 166–167, the Comment points out:

"The use of 'appreciate' rather than 'known' conveys a *broader sense of understanding* than simple cognition. * * * * Appreciating 'wrongfulness' may be taken to mean appreciating that the community regards the behavior as wrongful."

Against strong criticisms of the M'Naghten Rule and given stated improvements deemed fit and advisable by the American Law Institute, it is remarkable that in framing and adopting § 8.01 the only real significant extension made by the

---

6. In its entirety Section 4.01 reads:
   "Section 4.01. Mental Disease or Defect Excluding Responsibility.
   (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks *substantial capacity* either to *appreciate* the

criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.
   (2) as used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial misconduct."

Legislature is in its volitional component.[7]

As originally enacted, nothing in § 8.01 suggests that the Legislature so radically departed from the public policy of this state enunciated in our caselaw, as now to require "medical testimony regarding a mental disease of defect before the insanity defense is raised." While one objective of the Model Penal Code was to accommodate existing medical and psychological knowledge to the end that its practitioners are permitted to testify more in terms of their discipline, the fact of the matter is that the Legislature did not adopt the first part of its formulation. Instead, it adhered substantially to the cognitive component of the M'Naghten Rule which could be put in issue by nonexpert testimony.

Until today this Court has never held, much less intimated, that only testimony by an expert in the field will raise the issue of insanity. The dissenting opinion cites cases that are inapposite, and then reads into them implications that simply are not there.

*Graham v. State,* 566 S.W.2d 941 (Tex. Cr.App.1978), was decided in a context of expert testimony of insanity presented by accused and none by the State. Plainly, then, the issue was *raised* by accused, and there was no occasion for the Court to decide whether nonexpert testimony will raise it. Indeed, throughout germane parts of the opinion, quoting approvingly from two cases cited and discussed herein, *McGee v. State* and *Ross v. State,* both

supra, the Court stressed that "the issue is not strictly a medical one," *id.,* at 948, 949, 951, 952, thereby depreciating the value of expert testimony.[8] *Graham* also attests to importance of contemporaneous "circumstances of the crime itself" in determining the mental state of the accused at that time. *Id.,* at 951.

All this Court determined in *Denison v. State,* 651 S.W.2d 754 (Tex.Cr.App.1983) and *Cato v. State,* 534 S.W.2d 135 (Tex.Cr. App.1976), is that the evidence of lay witnesses, who never undertook to express a conclusion or opinion on insanity, was not sufficient to raise the issue. In *Denison* appellant pointed to testimony of his victim to the effect that because she regarded his conduct as "inappropriate," she felt he was "drugged," and her concession on crossexamination that such conduct could be caused by mental illness, *id.,* at 760; in *Cato* appellant himself testified to prior "visions concerning his wife" and "traumatic amnesia" about the facts of the offense, *id.,* at 138. In neither instance did the Court even allude to absence of expert testimony, and thus could not have "impliedly recognized" that "medical testimony is required to show the 'mental disease or defect' element of the affirmative defense of insanity." Slip Opinion, at 2. Indeed, *Cato* invites the reader to see § 8.01, and to compare two prior decisions of the Court, one of which applies the M'Naughten Rule.[9]

---

7. Yet, as the dissenting opinion points out in its note 1 that component was deleted in 1983. The long standing "knowledge" feature is retained, viz: "did not know his conduct was wrong." Except for a caveat in subsection (b) the statutory law of insanity is scarcely distinguishable from the caselaw prevailing before January 1, 1974. The dissent also takes pains to underscore the descriptive word "severe" that was inserted in the 1983 legislation. However, if as a *result* of mental disease or defect an accused does not know his conduct is wrong when he engages in it, then surely his mental disease or defect is severe. Introducing "severe" seems quite superfluous.

8. Elucidating the proposition, the Court declared:

"In deciding whether the abnormal mental condition of the accused will excuse criminal responsibility, the jury is not restricted to medical science theories of causation. The connective 'result' requirement of the issue encompassed the inarticulable ethical component, which includes imperatives of free will, self control, and responsibility for one's acts that are fundamental to our notions of man, and that are the foundation of social relations and criminal responsibility built on such a concept of man."
*Graham,* supra, at 953.

9. With regard to the dissenting opinion in *Madrid v. State,* 595 S.W.2d 106, at 116 (Tex.Cr. App.1979), suffice to say the thin bit quoted by the dissenting opinion at 3 is a recitation of historical fact made in the course of attempting to demonstrate that it was harmful reversible error for the trial court to permit the prosecution to argue because there is a presumption of sanity the State has no burden to produce evi-

■ Having shown the requirement of expert opinion the State would impose, and to the absence of which the El Paso Court of Appeals particularly noticed, to raise an issue of insanity is not founded in our law, and returning to the proper analysis under existing law, we hold that predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise the issue. However, we will not now determine whether the evidence is sufficient here, for that is a determination to be made by a court of appeals in the first instance, as on direct appeal.

Therefore, the judgment of the El Paso Court of Appeals is vacated, and we remand the cause to that court for further proceedings not inconsistent with this opinion.

ONION, Presiding Judge, concurring in part and dissenting in part.

I concur in the result reached, but I dissent to the remand. The record is before this Court and has been fully explored. The cause should be finalized here in the interest of justice and not kept in heavenly appellate orbit.

TEAGUE, J., joins this opinion.

McCORMICK, Judge, dissenting.

At the time of appellant's trial, the elements of the affirmative defense of insanity consisted of the following:

(1) At the time of the conduct charged,

(2) the actor, as a result of mental disease or defect,

(3)(a) did not know that his conduct was wrong, or

(b) was incapable of conforming his conduct to the requirements of the law he allegedly violated. V.T.C.A., Penal Code, Section 8.01.[1]

Thus, before the trial court was required to give a charge on the affirmative defense of insanity, there had to be some evidence in the record to support each element listed above. The Court of Appeals acknowledged that lay testimony is often competent evidence on the issue of insanity, but found, however, that there was no testimony demonstrating that appellant possessed a mental disease or defect.

The majority now finds that nonexpert witness testimony *may* be sufficient to meet the requirement of Article 46.03, Section 1(a) V.A.C.C.P., that there be *competent* evidence of insanity before the affirmative defense is submitted to the jury.

The old Penal Code (prior to January 1, 1974) provided that in order to establish the insanity defense, the evidence had to show that the defendant's *mental condition* at the time of the offense was such that he was unable to distinguish between right and wrong as to the particular act charged. When the new Penal Code was drafted, the phrase "mental condition" was changed to the more specific "mental disease or defect". This clearly shows the Legislature's intent to require a showing of a recognizable medical ailment. At least one commentator agrees:

"The [next] element of this test is the requirement of 'mental disease or defect'. It seems that *this test would require that the disease or defect be a recognizable medical disorder....*" Branch's Texas Annotated Penal Statutes, Section 8.01 (3d Edition), p. 280. (Emphasis added).

In *Graham v. State*, 566 S.W.2d 941, 948 (Tex.Cr.App.1978), this Court wrote the following:

"While the defense is expressed in terms of a 'mental disease or defect,' the issue is not strictly a medical one. It is an issue that invokes ethical and legal considerations as well." 566 S.W.2d at 948.

The opinion in *Graham* goes on to say that the determination of insanity can not be

---

dence. *Id.,* at 113, 116. To say that inclusion of historical fact is an "implied recognition" of a requirement in the law of insanity is inaccurate.

1. Effective August 29, 1983, the statute was amended to read: "(a) It is an affirmative de-

fense to prosecution that, at the time of the conduct charged, the actor, as a result of *severe* mental disease or defect, did not know that his conduct was wrong." (emphasis added). The offense in the instant case occurred on January 23, 1983.

based solely on medical evidence alone. Implicit in the text, however, is the acknowledgement that medical testimony is indeed essential in raising the issue of insanity for, indeed, the affirmative defense of insanity is largely made up of a "medical" component. This "mental disease or defect" component is one that limits the availability of the defense. *Graham v. State,* supra, at 952.

Although this Court has not in the past explicitly held that medical testimony is required to show the "mental disease or defect" element of the affirmative defense of insanity, we have impliedly recognized this requirement in a number of cases. In *Denison v. State,* 651 S.W.2d 754 (Tex.Cr. App.1983), this Court held that where the burglary victim who happened to be a nurse testified that the defendant's behavior was "inappropriate" and this "inappropriate conduct" could have been caused by mental illness, this testimony alone was totally insufficient to raise the defensive issue of insanity.

In *Cato v. State,* 534 S.W.2d 135 (Tex.Cr. App.1976), the defendant was charged with murdering his wife. At trial he testified that a few days prior to the offense, he experienced visions concerning his wife. He further testified that he remembered nothing about the actual killing except that he was arguing with his wife when she hit him causing him to pass out and when he awoke his wife had been strangled. After reviewing the entire record the Court found that there was no indication in the evidence that at the time of the offense, that "appellant, as a result of mental disease or defect, either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated." *Cato v. State,* supra, at 138. See also Judge Clinton's dissenting opinion in *Madrid v. State,* 595 S.W.2d 106, 116 (Tex.Cr.App.1979), where he noted that "[s]ince the defense was supported by *psychiatric* and other testimony, the trial court submitted insanity as an affirmative defense." (emphasis added). The majority fails to recognize that, without some testimony of *medical* ailment or disorder, the jury is without any

evidence to determine if a defendant suffers from a mental disease or ailment.

Moreover, even if medical testimony is not required in order to establish the "mental disease or defect" element, the lay witness evidence fails to establish an issue to insanity. Here the complaining witness' sister testified that, in her opinion, appellant was either drunk, addicted to drugs, or "he was not right in his mind." Appellant relied upon this testimony to assert that he was entitled to an instruction on insanity. That the witness surmised that the appellant "was not right in his mind" in no way shows a "mental disease or defect." *Denison v. State,* supra, at 760; *Cato v. State,* supra, at 138. Nothing in the record even suggests that at the time of the offense appellant was suffering from any recognizable medical disorder. Therefore, the trial court was correct in refusing to instruct the jury on the affirmative defense of insanity.

I, therefore, dissent to the action of the majority in the instant cause.

WHITE, J., joins this dissent.

