Affirmed and Memorandum Opinion filed October 27, 2009.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00541-CR

___________________

 

David King, Jr., Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 180th District Court

Harris County,
Texas



Trial Court Cause
No. 1067060

 



 

 

MEMORANDUM OPINION

Appellant, David King, Jr., appeals from his
conviction for murder.  A jury found appellant guilty, rejected his
affirmative defense of insanity, and assessed his punishment at 47 years’
imprisonment and a $10,000 fine.  In his sole issue on appeal, appellant
contends that the evidence was factually insufficient to support the jury’s
rejection of his insanity defense.  We affirm.

Background

On April 3, 2006, appellant shot and killed
complainant, Ivan Carrera, as complainant drove his
vehicle into the parking lot of the apartment complex where appellant
lived.  In a videotaped statement to police, appellant waived his rights
and then confessed to shooting complainant.  According to appellant, he
was standing on the grounds of the apartment complex when complainant drove his
truck into the parking lot and gave appellant an “evil look,” which implied
that complainant intended to kill appellant.  Appellant said that he “saw
evil” and a man looking at him “like it’s me or him.”  Appellant
maintained that complainant stopped near appellant like he knew appellant, as
though he may have been following appellant.  Complainant then backed up
his truck and pushed his glasses up to give appellant the “evil” look. 
Appellant asked complainant what was wrong with him, and according to
appellant, complainant motioned or gave appellant a look as if to say “you
already know”; then complainant appeared to want appellant to follow him, to
“come on,” and seemed to indicate to appellant that it was “me or you.” 
Appellant suggested that the apartment complex was a dangerous place and said
that no one had ever previously looked at him the way complainant did that
day.  Appellant couldn’t tell if complainant had a gun or not, but
appellant pulled his own pistol out of his pocket and shot complainant through
the window of complainant’s truck.  After shooting complainant, appellant
went back to his apartment where his girlfriend “sort of” lived.  He then
“went about his business . . . mission accomplished.”  He said that he saw
the police arrive at the complex but did not make a report because he was
“still like lost in [his] mind.”  When asked what he did with his gun,
appellant stated that he gave it to a friend and that the friend “got rid of
it.”  Appellant acknowledged in the interview that he had never met
complainant before the day of the shooting.

A couple of people who lived in the same apartment
complex as appellant testified that they had seen appellant around the complex
and that he seemed normal.  This included Claudia Patina, a leasing
manager for the complex, and her boyfriend, Fredie
Ortega.  Ortega was also the only eyewitness to the shooting to come
forward and talk to police.  He testified that on the day of the shooting,
he saw complainant drive into the complex parking lot.  Appellant then
pulled out a gun and shot at complainant’s vehicle.  The vehicle proceeded
to hit a couple of other vehicles in the lot.  Ortega went inside his
apartment to tell Patina, and when he came back out, appellant had
“disappeared.”

Several Houston Police Department officers involved
in the investigation of the shooting also testified.  One of the first
officers to arrive on the scene was G.E. Polk, who testified that he did not
see anyone at the scene “acting crazy or out of control” and no one came
forward to confess to the shooting.  Sergeant Tony Huynh testified that
after appellant was arrested, based on information obtained from Fredie Ortega, he (Huynh) participated in an interview with
appellant.  Huynh said that nothing seemed to be “out of the ordinary”
with appellant, that his facial expressions seemed appropriate for the
circumstances, and that he appeared to understand his rights when they were
recited by one of the officers.  Huynh detailed his training and
experience as an HPD hostage negotiator and indicated that appellant did not
appear to be in mental distress unlike people with whom he has had to negotiate
in the past.  Officer Norio Sanchez testified that on March 28, 2006, he
participated in appellant’s arrest by obtaining booking information from him
and transporting him to jail.  Sanchez stated that appellant was able to
give him the information he needed and acted:  “Pretty normal.  Pretty nonchalant.”  Sanchez did not observe appellant
talking to himself or to someone who was not there and did not “see him acting
erratically in any way.”

Dr. Ramon Laval, a clinical psychologist, testified
that he is a consultant for the Mental Health and Mental Retardation Authority
(MHMRA) Forensic Psychiatric Unit.  Pursuant to a court order, he
evaluated appellant’s competency to stand trial and determined that as of the
time of the evaluation, November 4, 2006, appellant was not competent for
trial.  Laval concluded that appellant was suffering from paranoia,
hallucinations, and delusional ideations both at the time of the shooting and
while in jail.  Appellant seemed to think that he was “being tracked” by evil
spirits or people, perhaps through the gold coverings on his teeth. 
Appellant reported to Laval that he had been hearing voices, starting about two
months before the shooting, which were telling him that he was “God’s child”
and had to save the world.  Appellant further told Laval that he had
identified complainant as “the individual who was looking for him with the
intention of killing him.”  Laval opined that while some people are prone
to fake or exaggerate symptoms, he did not believe that appellant was faking or
exaggerating in this instance.  Although Laval evaluated appellant only
for competence to stand trial and not for sanity at the time of the shooting,
he (Laval) believed that many of appellant’s thought processes would be
relevant to both determinations.  Although Laval initially found appellant
incompetent for trial, appellant was later found to have gained competence
sufficient for trial.

Dr. Stephen Paul McCary, a
psychologist, testified that he is employed by the MHMRA Forensic Psychiatric
Unit at the Harris County Jail.  He performed a sanity evaluation of
appellant in July 2007, pursuant to a court order, and concluded that appellant
was legally insane at the time of the shooting, i.e., appellant could
not tell right from wrong.  Prior to the evaluation, appellant had been
placed on antipsychotic drugs at North Texas State Hospital.  During the
interview, appellant reported that he had experienced visual and auditory
hallucinations but that the medications were helping to control them. 
Appellant believed that someone was “out to get him,” and when asked who that
was, appellant responded “whoever the devil talks to.”  Appellant further
told McCary that voices told him to shoot complainant
because complainant was following appellant to kill him.  Appellant
additionally stated that previously he had believed that he had “special
powers” to change movies on television, but by the time of the interview, he no
longer held this belief.

Dr. Mark Moeller, a psychiatrist, testified that he
was hired by the State to evaluate appellant’s sanity.  Moeller reviewed
Laval’s and McCary’s prior reports as well as
appellant’s medical records and videotaped confession.  He also
interviewed appellant.  Moeller noted that the state hospital considered
appellant “really pretty sick” at the time of his arrival.  The staff
treated appellant with “fairly high doses of antipsychotic medication and
therapy” before releasing him back to the jail.  Moeller stated that it
was “a little unusual” for a patient presenting as sick as appellant to “recompensate” so quickly and be essentially a “no problem
patient.”  Moeller opined that the videotaped interview of appellant was
very important because it was close in time to the shooting.  In
discussing the interview, Moeller noted that appellant behaved appropriately
and was responsive.  Moeller further did not see any indication in the
interview of “psychosis or really big mental defects.”  Moeller explained
that appellant’s statements about leaving the scene after the shooting, staying
inside away from the police, and giving his gun to a friend who then disposed
of it, indicated that appellant was aware of having done something wrong. 
Moeller further explained that appellant’s description of the incident, in
which appellant essentially described feeling threatened by complainant,
appeared realistic and not the product of hallucinations.  Although
appellant had described seeing “evil” and had mentioned being “lost in [his]
mind,” Moeller apparently did not see these statements as necessarily
indicative of insanity.  Moeller further stated that he did not notice any
indication of appellant’s faking or exaggerating his mental condition at the
time of the evaluation and said that he had no reason to doubt appellant’s
report that he had heard voices on a number of occasions.

Dr. Seth Silverman, also a psychiatrist, was hired by
the defense to offer an opinion regarding appellant’s sanity at the time of the
offense.  After reviewing medical and police reports; talking to
detectives, a treating physician at the state hospital, and members of
appellant’s family; and interviewing appellant, Silverman concluded that
appellant was legally insane at the time of the shooting.  Silverman found
it particularly telling that appellant was placed on such high dosages of
medication at the state hospital.  He further opined that the shooting
itself appeared to be “an illogical act,” with no “documented history” behind
it.  He also noted that the shooting occurred in the open.  Like Moeller,
Silverman saw the videotaped interview as highly significant because it had
occurred in close proximity to the shooting.  Contrary to Moeller,
Silverman believed that appellant’s statements regarding an “evil” look and
“mission accomplished” were more delusional than logical.  Silverman
believed that the same was true regarding appellant’s statements about feeling
threatened or as though someone was “out to get him.”

Appellant’s mother, Samantha King, testified that
sometime between the end of 2005 and April of 2006, appellant entered King’s
mother’s house and began “talking out of his head, saying all kinds of
stuff.”  Appellant quoted Bible passages and claimed that the world was
going to end and a lot of evil things were going to occur.  He advised them
to stay off the telephone because of the evil voices and told them that they
should leave.  When King tried to get appellant to watch a Christian DVD,
appellant claimed that people on the television were talking to him.  King
said that when she visited appellant in jail after his arrest, he was still
“acting the same way,” but when he returned from the state hospital, he looked
and sounded better.

In her testimony, appellant’s sister, Zekeithia Chattman, also recalled
an incident, around the end of February or beginning of March 2006, in which
appellant “began to act unusual.”  Chattman’s
and appellant’s cousin brought appellant into their grandmother’s home, and
appellant “was just talking out of his head.”  He was saying that the
world was coming to an end, that he had had a talk with God, and that the
family needed to leave Houston and go to Atlanta.  He further advised them
to stop using cell phones because he was “hearing voices on the cell
phone.”  Appellant was ranting and repeating himself during the episode.

At the conclusion of the trial, the jury found
appellant guilty of murder and rejected his insanity defense.

Analysis

In his sole issue, appellant challenges the factual
sufficiency of the evidence to support the jury’s rejection of his insanity
defense.  “It is an affirmative defense to prosecution that, at the time
of the conduct charged, the actor, as a result of severe mental disease or
defect, did not know that his or her conduct was wrong.”  Tex. Penal Code § 8.01.  A defendant raising the
insanity defense bears the burdens of proof and persuasion.  Meraz
v. State, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990).  In
reviewing the factual sufficiency of the evidence concerning an insanity
defense, the standard is whether after considering all the relevant evidence,
the judgment is so against the great weight and preponderance of the evidence
as to be manifestly unjust.  Bigby v. State, 892 S.W.2d 864, 875 (Tex. Crim. App. 1994). 
The question of insanity is generally one for the factfinder,
not only for determinations of credibility and weight of the evidence but also
for setting the limits of the defense itself.  Graham
v. State, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978).  This is
because the issue is not strictly medical but also
involves legal and ethical considerations.  See Bigby,
892 S.W.2d at 877-78 (discussing Graham).  For these same reasons,
a factfinder is not limited to considering only
expert testimony regarding the defendant’s mental condition but may also
consider lay witness testimony on the matter, particularly regarding the
circumstances of the alleged offense.  See Pacheco v. State, 757 S.W.2d 729, 733-36 (Tex. Crim. App. 1988).

Here, as appellant acknowledges, the record contains
both evidence supporting the conclusion that appellant was sane at the time of
the shooting, i.e., knew right from wrong, and evidence supporting the
opposite, that appellant was insane at the time, i.e., did not know
right from wrong due to severe mental disease or defect.  Supporting the
jury’s conclusion that appellant was sane is the testimony of Dr. Moeller, who
testified regarding his experience in such matters and stated his conclusion
that appellant was sane at the time of the shooting.  The record also
contains testimony from several people who observed appellant around the time
of the offense, residents at the same apartment complex as appellant as well as
police officers involved in his arrest and subsequent interview.  Each of
these witnesses testified that appellant acted normally during that time period
and did nothing to suggest mental imbalance.  The record additionally
contains the videotaped interview of appellant.  In watching this
interview, the jury was able to observe appellant’s demeanor, his conduct, and
his explanation for his actions.  In the interview, appellant described
how he perceived complainant to be threatening him with looks, gestures, and
conduct, as well as how he (appellant) considered the apartment complex to be a
dangerous place.  Appellant further explained that after the shooting, he
went back to his apartment, actively avoided the police, and subsequently gave
his gun to a friend who “got rid of it.”

Appellant argues that appellant’s description of the
shooting is illogical and irrational and that Moeller ignored these problems
when he concluded that appellant was sane.  However, from a certain
perspective, most crimes are illogical and irrational.  Logic and
rationality of action are not the test for sanity; the
test is whether appellant understood right from wrong at the time of the
conduct in question.  See Tex. Penal Code § 8.01.  Based on
the evidence presented, both Moeller and the jury could have concluded that
appellant knew right from wrong even though he shot someone whom he’d never met
before.  Appellant’s arguments also ignore appellant’s own statement
wherein he described being threatened by complainant with looks, gestures, and
conduct in what appellant described as a dangerous area.  Such statements
at least provide a reason for appellant’s actions that does not necessarily
implicate severe mental disease or defect.

Appellant further discounts Moeller’s emphasis on
appellant’s statement that he gave his gun to a friend after the
shooting.  According to appellant, this act in and of itself is
meaningless without more information as to why appellant gave the gun away.
 However, from the context of the statement, a factfinder
could logically deduce that appellant gave the gun away so that it could not be
used to connect him to the shooting.  Appellant didn’t give away just any gun, he gave the gun he had recently used to shoot someone
to a friend.  Also, immediately after making this statement, appellant
added that the friend “got rid of it,” an indication that the very reason
appellant gave the gun to the friend was for the friend to dispose of it
somehow.

Appellant assails Moeller’s analysis as ignoring
evidence about appellant’s “distorted thought processes.”  To the
contrary, Moeller testified regarding appellant’s mental health difficulties
but concluded, largely based on his observations of the videotaped interview,
that appellant was sane at the time of the offense.  In other words,
Moeller did not ignore the evidence in question but simply placed less weight
on it than he did the interview.  Regarding the interview, appellant
emphasizes comments made therein concerning “evil” and appellant having
accomplished a “mission” when he shot complainant.  From the context of
the interview itself, however, Moeller and the jury could have logically
concluded that by “evil,” appellant was referring to nothing more than a “look”
he received from complainant, and by “mission,” appellant was simply referring
to having defended himself against the perceived threat from complainant.

There is also evidence in the record suggesting that
appellant may have been insane at the time of the shooting.  The state
hospital staff diagnosed him as being highly delusional and prescribed high
dosages of antipsychotic medication.  Doctors McCary
and Silverman concluded appellant was insane at the time, and Dr. Laval found
appellant incompetent to stand trial.  Members of appellant’s family also
described what appeared to them to be a delusional episode sometime prior to
the shooting.  Also relevant are appellant’s own comments both on the
videotape and to psychiatric caregivers and evaluators.  The jury was free
to disregard this evidence as unreliable.  Bellaire v. State, 110
S.W.3d 664, 670 (Tex. App.—Houston [14th Dist.] 2003, pet. ref’d)
(“The jury is the sole judge of the credibility of the evidence and may accept
or reject all or any part of the witnesses’ testimony.”).  Given the
substantial evidence indicating sanity at the relevant time, we cannot say that
the jury’s verdict was so against the great weight and preponderance of the evidence
as to be manifestly unjust.  Accordingly, we overrule appellant’s sole
issue.

           
We affirm the trial court’s judgment.

                                                                                   


                                                                       
/s/        Adele Hedges

                                                                                   
Chief Justice

 

 

 

Panel consists
of Chief Justice Hedges and Justices Seymore and Sullivan.

Do Not Publish — Tex. R. App. P. 47.2(b).