IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-10-00313-CV

 

Ronald Calvin,

                                                                                    Appellant

 v.

 

Jim L. Beard,

                                                                                    Appellee

 

 



From the County Court at Law No. 2

Brazos County, Texas

Trial Court No. 4898-B

 



MEMORANDUM  Opinion










 

            Ronald Calvin appeals the judgment
rendered against him in an eviction suit for a commercial tenancy.  The suit
was originally tried in the justice court which granted judgment for possession
to Jim L. Beard.  Calvin appealed to the County Court at Law #2.  Judgment was
rendered by that court in favor of Beard.  

            Beard filed a motion to dismiss the
appeal, arguing that a final judgment of a county court in an eviction suit may
not be appealed on the issue of possession unless the premises in question are
being used for residential purposes only.  Tex.
Prop. Code Ann. § 24.007 (Vernon 2000).  Calvin asked to mediate the
appeal.  We granted his request, referred the appeal to mediation, and
suspended the appeal.  Beard objected to the referral.  

            We sustain Beard’s objection and lift
the suspension of the appeal.

            We agree with Beard that according to
section 24.007 of the Texas Property Code, Calvin has no right to appeal.  Id.  In coming to this conclusion, we do not address the merits of any issue,
specifically including res judicata or the proper construction of the
settlement agreement.  We simply do not have jurisdiction of this appeal.

            Accordingly, we grant Beard’s motion
to dismiss, and this appeal is dismissed.  See Tex. R. App. P. 42.3(a).

 

                                                                        TOM
GRAY

                                                                        Chief
Justice

 

Before
Chief Justice Gray,

            Justice
Reyna, and

            Justice
Davis

Objection
sustained

Motion
granted

Appeal
dismissed

Opinion
delivered and filed November 3, 2010

[CV06]






d in his
eyes.  He wasn’t hisself.”  [sic]

          “He looked dangerous.  His eyes was
bloodshot.”

          “He wasn’t Terrence.  He was somebody
else.  I can’t explain it.”

          “He was just jumping, moving, moving
around in his seat, jumping and going on, just—I don’t know.  I cannot
explain.  Just jumping and looking crazy and funny and strange and everything.”

 

          “It scared me.  I had never seen him
that way.  Never have seen him in that condition, the way he was.”

 

          When Baker saw that Kelly had a
handgun, she stopped her car and told him to give it to her.  They started
fighting for control of the gun, and it discharged.  Baker then fled the car.

          Kelly’s brother Wendell Woods found
him sitting in Baker’s car with the engine running.  Woods called Kelly’s name
several times before he responded, saying that he had been shot.  Kelly then
got in Woods’s car, and Woods started driving him to the hospital.  Kelly
“started praying and talking random talk, just random talking.”  Woods
testified that he “couldn’t really comprehend what [Kelly] was saying, it was
such a random . . .”

          As Woods drove Kelly to the hospital,
Kelly asked, “Is this the end of me?”  According to Woods, Kelly “didn’t know
if he was him or who he was.”  Kelly then hit Woods in the face, causing them
to crash into a pole.  Woods fled the car and went to a nearby house to report
the accident.  As Woods knocked on the door of the house, Kelly ran up from
behind, kicked the door in, and forced Woods inside.  Kelly and Woods wrestled
in the house.  Woods “finally tossed him over my shoulder into the bathtub, and
[Kelly] started yelling he’s burning up.”

          When firefighters responded to the scene,
Woods began discussing the accident with them.  “[A] few minutes later [Kelly]
came outside of the house with no clothes on, just underwear.”  “When he got
outside and he saw the lights, he tripped with the lights and he started
dancing, messing with the gauges of the fire engine, climbing on top of it,
running around.”

          On cross-examination, Woods was asked
to describe Kelly’s initial appearance when Woods found him sitting in Baker’s
car.

          “The look was—Jekyll and Hyde.  That’s
the closest I can get to you.”

          “He was startled.  He didn’t know who
I was.”

          One of the firefighters who responded
to the accident testified that they found Kelly in the bathroom saying, “I’m
one with the Lord, and I’m walking with Jesus tonight.”  Kelly came out of the
bathroom repeatedly chanting this phrase.  The firefighter believed Kelly to
have “an altered mental status.”  Kelly then ran from the house, stripping off
his clothing as he ran.  He then tried to climb into the front right seat of
the fire truck.  The firefighter tried to prevent Kelly from entering the fire
truck.  They struggled, and Kelly eventually walked away.

          As Kelly walked in the street,
continuing to chant the above-quoted phrase, the firefighter tried to persuade
him to stop walking in the street and get on the sidewalk.  “All of a sudden,”
Kelly turned and ran for the fire truck again.  He climbed into the cab and
began activating the sirens and air horns.  The firefighters waited for the
police to arrive and remove Kelly from the fire truck.

          Dr. Rod Ryan, a jail physician,
testified about mental health treatment Kelly received while awaiting trial. 
Dr. Ryan testified that about four months after Kelly’s arrest, he began
exhibiting symptoms of depression, so the doctor prescribed a small dose of an
antidepressant, amitriptyline.  Dr. Ryan observed no change in Kelly’s
condition after a month, so he continued to prescribe this medication.  Later,
Dr. Ryan decided to increase the dosage because there had been no improvement
in Kelly’s symptoms.

          About nine months after arrest, Kelly
reported to Dr. Ryan that he was hearing voices.  Considering Kelly’s
depression, Dr. Ryan concluded that Kelly was in an “unstable mood situation .
. . rather than overtly psychotic.”  The doctor testified that this would be
clinically classified as a mood disorder.  He prescribed divalproic acid, a
“mood stabilizer,” for Kelly.

          Some months later, an MHMR worker
conducted a mental health exam on Kelly and concluded that he was exhibiting
symptoms of paranoia.  In response, Dr. Ryan prescribed a small dosage of Haldol,
an antipsychotic medication.  After about two months, the doctor evaluated
Kelly and concluded that the current dosages were appropriate.  At trial, he
read a note authored by a psychiatrist who had seen Kelly, stating that Kelly
continued to hear voices and suggesting that an increase in the dosage of Haldol
be considered.  Dr. Ryan testified that he could not give an opinion as to
whether Kelly suffers from a mental disease or defect which prevented him from
knowing right from wrong on the date of the crimes of which he was convicted.

Pertinent Law

          “A defendant is entitled to an instruction
on [a defensive issue] if the issue is raised by the evidence, whether that
evidence is strong or weak, unimpeached or contradicted, and regardless of what
the trial court may think about the credibility of the defense.”  Ferrel v.
State, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); Johnson v. State,
157 S.W.3d 48, 50 (Tex. App.—Waco 2004, no pet.); accord King v. State,
174 S.W.3d 796, 813 (Tex. App.—Corpus Christi 2005, pet. ref’d); Stefanoff
v. State, 78 S.W.3d 496, 499 (Tex. App.—Austin 2002, pet. ref’d); Pennington
v. State, 54 S.W.3d 852, 856 (Tex. App.—Fort Worth 2001, pet. ref’d).  We
review the evidence in the light most favorable to the defendant to determine
whether a defensive issue should have been submitted.  See Ferrel, 55
S.W.3d at 591; Johnson, 157 S.W.3d at 50; Stefanoff, 78 S.W.3d at
500; Pennington, 54 S.W.3d at 856.

          Section 8.01 of the Penal Code
provides for the affirmative defense of insanity:

          It is an affirmative defense to
prosecution that, at the time of the conduct charged, the actor, as a result of
severe mental disease or defect, did not know that his conduct was wrong.

 

Tex. Pen. Code Ann. § 8.01(a) (Vernon 2003).

          The parties agree that the decision of
the Court of Criminal Appeals in Pacheco v. State sets out the standard for
determining whether the evidence raises the issue of insanity.  757 S.W.2d 729
(Tex. Crim. App. 1988).  Among other things, the Court in Pacheco made
clear that “predicated lay opinion testimony when considered with facts and
circumstances concerning an accused and of the offense may be sufficient to
raise the issue [of insanity].”  Id. at 736; accord Bigby v. State,
892 S.W.2d 864, 888 (Tex. Crim. App. 1994); Nutter v. State, 93 S.W.3d 130,
131 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  However, the Court also reaffirmed
two prior decisions in which it was determined “that the evidence of lay
witnesses, who never undertook to express a conclusion or opinion on insanity,
was not sufficient to raise the issue.”  Pacheco, 757 S.W.2d at 735
(citing Denison v. State, 651 S.W.2d 754 (Tex. Crim. App. 1983); Cato
v. State, 534 S.W.2d 135 (Tex. Crim. App. 1976)).

          On remand, the El Paso Court of
Appeals concluded that the testimony of the lay witnesses whose testimony was
under consideration did not raise the issue of insanity.  Pacheco v. State,
770 S.W.2d 834, 836 (Tex. App.—El Paso), pet. ref’d, 769 S.W.2d 942
(Tex. Crim. App. 1989) (per curiam) (“Pacheco II”).  One of these
witnesses testified that in her opinion Pacheco “may have been either drunk or
drugged or not in his right mind—he was not very well.”  Id. at 836. 
The other testified that he was “just not right.”  Id.

          The court’s analysis of these
“opinions” was as follows:

          Are we to equate “not very well” with “legally
insane.”  We do not consider Nunez’s statement that he was either drunk,
drugged or not in his right mind as representing three alternative but definite
opinions as to Appellant’s mental and physical status, but as a purely
speculative, spectrum offer of characterization of the degree of abnormality in
his behavior.  It is inappropriate to focus upon her inclusion of mental
incapacity in the list of speculations, without due regard to the alternative
context of her suggestions.  This is no definite opinion of insanity. 
To hold otherwise is tantamount to saying that a guess that the pea is either
under the first, second or third shell is a definite opinion as to each.  Try
and collect your winnings on that kind of guess.  The Ramos testimony is even
weaker.  While stating that he was “just not right,” she concluded her response
to the inquiry with a flat “I don’t know.”

 

Id. (emphasis added).

Application

          Here, the victim Thomas testified that
she could not describe Kelly’s appearance.  She characterized his appearance as
“the Devil himself”; “It did not [look like Kelly]”; and “It was a look of
nothing.  A blank look.”  Kelly’s mother testified in a similar manner that
Kelly wasn’t himself.  “He wasn’t Terrence.  He was somebody else.  I can’t
explain it.”

          Kelly’s brother described the markedly
abnormal behavior which Kelly exhibited that evening.  He characterized Kelly’s
appearance as “Jekyll and Hyde.”  He testified that Kelly didn’t know who he
(Kelly’s brother) was.

          The testimony of these witnesses is
similar to that of the witnesses in Pacheco.  All three essentially
testified that Kelly was “not himself,” but none of them “undertook to express
a conclusion or opinion on insanity.”  See Pacheco, 757 S.W.2d at 735; see
also Pacheco II, 770 S.W.2d at 836.

          The firefighter also testified to
Kelly’s abnormal behavior.  He believed Kelly to have “an altered mental
status,” presumably due to his abnormal behavior.  Like the prior witnesses however,
the firefighter did not “undert[ake] to express a conclusion or opinion on
insanity.”  Id.

          Finally, Dr. Ryan testified that Kelly
had been diagnosed in the jail with depression, a mood disorder, and paranoia,
concededly mental diseases or defects.  However, the doctor expressly declined
to offer an opinion as to Kelly’s sanity at the time of the offense.

          Evidence of mental disease or defect
does not, standing alone, equate to evidence of insanity.  See Nutter,
93 S.W.3d at 132; Atomanczyk v. State, 776 S.W.2d 297, 299-301 (Tex. App.—Houston [1st Dist.] 1989), pet. dism’d, improvidently granted, 800 S.W.2d 224
(Tex. Crim. App. 1990) (per curiam).  Like the other witnesses, Dr. Ryan did
not “undert[ake] to express a conclusion or opinion on insanity.”  See
Pacheco, 757 S.W.2d at 735; see also Pacheco II, 770 S.W.2d at 836.

Conclusion

The record contains evidence that Kelly was not
“himself” during the commission of the offense, that he was acting in a
significantly abnormal manner on that date, and that he experienced mental
disease or defect afterward.  However, there is no testimony in the record, lay
or expert, providing a “definite opinion of insanity.”  See Pacheco II,
770 S.W.2d at 836.  Accordingly, we overrule Kelly’s sole point and affirm the
judgment.

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

(“Chief Justice Gray concurs in the result,
noting that the opinion focuses on the absence of evidence of an opinion on
Kelly’s sanity.  I believe the focus should be that there is no evidence in the
record to even suggest that Kelly did not know right from wrong at the time he
committed the offense.  Accordingly, there was no evidence which required the
submission of the defensive issue.”)

Affirmed

Opinion delivered and
filed May 24, 2006

Publish

[CRPM]