Terrence Dewaine KELLY, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 10–05–00209–CR, 10–05–00210–CR.

Court of Appeals of Texas, Waco.

May 24, 2006.

---

John R Donahue, Waco, for appellant.

John W. Segrest, McLennan County Dist. Atty., Waco, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

A jury convicted Terrence Dewaine Kelly of murder and attempted murder and assessed his punishment at life imprisonment and a $10,000 fine for each offense. Kelly contends in his sole point that the court erred by denying his request for an instruction in the charge on the affirmative defense of insanity. Because there is no testimony in the record providing a definite opinion on the issue of insanity, we will affirm.

### Pertinent Testimony

Kelly cites the testimony of several witnesses to support his contention. The complainant in the attempted murder, Carolyn Thomas, was asked to describe Kelly's appearance when he fatally shot Thomas's mother and shot Thomas in the face.

"I cannot describe it, that look."

He looked like "the Devil himself."

"It did not [look like Kelly]."

"It was a look of nothing. A blank look."

Kelly called his mother Ada Baker after the shooting and asked her to come get him. Baker was also asked to describe his appearance that evening.

"It scared me the way he looked in his eyes. He wasn't hisself." [sic]

"He looked dangerous. His eyes was bloodshot."

"He wasn't Terrence. He was somebody else. I can't explain it."

"He was just jumping, moving, moving around in his seat, jumping and going on, just-I don't know. I cannot explain. Just jumping and looking crazy and funny and strange and everything."

"It scared me. I had never seen him that way. Never have seen him in that condition, the way he was."

When Baker saw that Kelly had a handgun, she stopped her car and told him to give it to her. They started fighting for control of the gun, and it discharged. Baker then fled the car.

Kelly's brother Wendell Woods found him sitting in Baker's car with the engine running. Woods called Kelly's name several times before he responded, saying that he had been shot. Kelly then got in

Woods's car, and Woods started driving him to the hospital. Kelly "started praying and talking random talk, just random talking." Woods testified that he "couldn't really comprehend what [Kelly] was saying, it was such a random . . ."

As Woods drove Kelly to the hospital, Kelly asked, "Is this the end of me?" According to Woods, Kelly "didn't know if he was him or who he was." Kelly then hit Woods in the face, causing them to crash into a pole. Woods fled the car and went to a nearby house to report the accident. As Woods knocked on the door of the house, Kelly ran up from behind, kicked the door in, and forced Woods inside. Kelly and Woods wrestled in the house. Woods "finally tossed him over my shoulder into the bathtub, and [Kelly] started yelling he's burning up."

When firefighters responded to the scene, Woods began discussing the accident with them. "[A] few minutes later [Kelly] came outside of the house with no clothes on, just underwear." "When he got outside and he saw the lights, he tripped with the lights and he started dancing, messing with the gauges of the fire engine, climbing on top of it, running around."

On cross-examination, Woods was asked to describe Kelly's initial appearance when Woods found him sitting in Baker's car.

"The look was—Jekyll and Hyde. That's the closest I can get to you."

"He was startled. He didn't know who I was."

One of the firefighters who responded to the accident testified that they found Kelly in the bathroom saying, "I'm one with the Lord, and I'm walking with Jesus tonight." Kelly came out of the bathroom repeatedly chanting this phrase. The firefighter believed Kelly to have "an altered mental status." Kelly then ran from the house,

stripping off his clothing as he ran. He then tried to climb into the front right seat of the fire truck. The firefighter tried to prevent Kelly from entering the fire truck. They struggled, and Kelly eventually walked away.

As Kelly walked in the street, continuing to chant the above-quoted phrase, the firefighter tried to persuade him to stop walking in the street and get on the sidewalk. "All of a sudden," Kelly turned and ran for the fire truck again. He climbed into the cab and began activating the sirens and air horns. The firefighters waited for the police to arrive and remove Kelly from the fire truck.

Dr. Rod Ryan, a jail physician, testified about mental health treatment Kelly received while awaiting trial. Dr. Ryan testified that about four months after Kelly's arrest, he began exhibiting symptoms of depression, so the doctor prescribed a small dose of an antidepressant, amitriptyline. Dr. Ryan observed no change in Kelly's condition after a month, so he continued to prescribe this medication. Later, Dr. Ryan decided to increase the dosage because there had been no improvement in Kelly's symptoms.

About nine months after arrest, Kelly reported to Dr. Ryan that he was hearing voices. Considering Kelly's depression, Dr. Ryan concluded that Kelly was in an "unstable mood situation . . . rather than overtly psychotic." The doctor testified that this would be clinically classified as a mood disorder. He prescribed divalproic acid, a "mood stabilizer," for Kelly.

Some months later, an MHMR worker conducted a mental health exam on Kelly and concluded that he was exhibiting symptoms of paranoia. In response, Dr. Ryan prescribed a small dosage of Haldol, an antipsychotic medication. After about two months, the doctor evaluated Kelly and concluded that the current dosages

were appropriate. At trial, he read a note authored by a psychiatrist who had seen Kelly, stating that Kelly continued to hear voices and suggesting that an increase in the dosage of Haldol be considered. Dr. Ryan testified that he could not give an opinion as to whether Kelly suffers from a mental disease or defect which prevented him from knowing right from wrong on the date of the crimes of which he was convicted.

### Pertinent Law

"A defendant is entitled to an instruction on [a defensive issue] if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex.Crim.App.2001); *Johnson v. State*, 157 S.W.3d 48, 50 (Tex. App.-Waco 2004, no pet.); *accord King v. State*, 174 S.W.3d 796, 813 (Tex.App.-Corpus Christi 2005, pet. ref'd); *Stefanoff v. State*, 78 S.W.3d 496, 499 (Tex.App.-Austin 2002, pet. ref'd); *Pennington v. State*, 54 S.W.3d 852, 856 (Tex.App.-Fort Worth 2001, pet. ref'd). We review the evidence in the light most favorable to the defendant to determine whether a defensive issue should have been submitted. *See Ferrel*, 55 S.W.3d at 591; *Johnson*, 157 S.W.3d at 50; *Stefanoff*, 78 S.W.3d at 500; *Pennington*, 54 S.W.3d at 856.

Section 8.01 of the Penal Code provides for the affirmative defense of insanity:

It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

TEX. PEN.CODE ANN. § 8.01(a) (Vernon 2003).

The parties agree that the decision of the Court of Criminal Appeals in *Pacheco v. State* sets out the standard for determining whether the evidence raises the issue of insanity. 757 S.W.2d 729 (Tex. Crim.App.1988). Among other things, the Court in *Pacheco* made clear that "predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise the issue [of insanity]." *Id.* at 736; *accord Bigby v. State*, 892 S.W.2d 864, 888 (Tex.Crim.App.1994); *Nutter v. State*, 93 S.W.3d 130, 131 (Tex. App.-Houston [14th Dist.] 2001, no pet.). However, the Court also reaffirmed two prior decisions in which it was determined "that the evidence of lay witnesses, who never undertook to express a conclusion or opinion on insanity, was not sufficient to raise the issue." *Pacheco*, 757 S.W.2d at 735 (citing *Denison v. State*, 651 S.W.2d 754 (Tex.Crim.App.1983); *Cato v. State*, 534 S.W.2d 135 (Tex.Crim.App.1976)).

On remand, the El Paso Court of Appeals concluded that the testimony of the lay witnesses whose testimony was under consideration did not raise the issue of insanity. *Pacheco v. State*, 770 S.W.2d 834, 836 (Tex.App.-El Paso), *pet. ref'd*, 769 S.W.2d 942 (Tex.Crim.App.1989) (per curiam) ("*Pacheco II*"). One of these witnesses testified that in her opinion Pacheco "may have been either drunk or drugged or not in his right mind—he was not very well." *Id.* at 836. The other testified that he was "just not right." *Id.*

The court's analysis of these "opinions" was as follows:

Are we to equate "not very well" with "legally insane." We do not consider Nunez's statement that he was either drunk, drugged or not in his right mind as representing three alternative but definite opinions as to Appellant's mental and physical status, but as a purely speculative, spectrum offer of characterization of the degree of abnormality in his behavior. It is inappropriate to fo-

cus upon her inclusion of mental incapacity in the list of speculations, without due regard to the alternative context of her suggestions. *This is no definite opinion of insanity.* To hold otherwise is tantamount to saying that a guess that the pea is either under the first, second or third shell is a definite opinion as to each. Try and collect your winnings on that kind of guess. The Ramos testimony is even weaker. While stating that he was "just not right," she concluded her response to the inquiry with a flat "I don't know."

*Id.* (emphasis added).

### Application

■ Here, the victim Thomas testified that she could not describe Kelly's appearance. She characterized his appearance as "the Devil himself"; "It did not [look like Kelly]"; and "It was a look of nothing. A blank look." Kelly's mother testified in a similar manner that Kelly wasn't himself. "He wasn't Terrence. He was somebody else. I can't explain it."

Kelly's brother described the markedly abnormal behavior which Kelly exhibited that evening. He characterized Kelly's appearance as "Jekyll and Hyde." He testified that Kelly didn't know who he (Kelly's brother) was.

The testimony of these witnesses is similar to that of the witnesses in *Pacheco.* All three essentially testified that Kelly was "not himself," but none of them "undertook to express a conclusion or opinion on insanity." *See Pacheco,* 757 S.W.2d at 735; *see also Pacheco II,* 770 S.W.2d at 836.

The firefighter also testified to Kelly's abnormal behavior. He believed Kelly to have "an altered mental status," presumably due to his abnormal behavior. Like the prior witnesses however, the firefighter did not "undert[ake] to express a conclusion or opinion on insanity." *Id.*

Finally, Dr. Ryan testified that Kelly had been diagnosed in the jail with depression, a mood disorder, and paranoia, concededly mental diseases or defects. However, the doctor expressly declined to offer an opinion as to Kelly's sanity at the time of the offense.

■ Evidence of mental disease or defect does not, standing alone, equate to evidence of insanity. *See Nutter,* 93 S.W.3d at 132; *Atomanczyk v. State,* 776 S.W.2d 297, 299–301 (Tex.App.-Houston [1st Dist.] 1989), *pet. dism'd, improvidently granted,* 800 S.W.2d 224 (Tex.Crim.App. 1990) (per curiam). Like the other witnesses, Dr. Ryan did not "undert[ake] to express a conclusion or opinion on insanity." *See Pacheco,* 757 S.W.2d at 735; *see also Pacheco II,* 770 S.W.2d at 836.

### Conclusion

The record contains evidence that Kelly was not "himself" during the commission of the offense, that he was acting in a significantly abnormal manner on that date, and that he experienced mental disease or defect afterward. However, there is no testimony in the record, lay or expert, providing a "definite opinion of insanity." *See Pacheco II,* 770 S.W.2d at 836. Accordingly, we overrule Kelly's sole point and affirm the judgment.

Chief Justice GRAY concurs in the result, noting that the opinion focuses on the absence of evidence of an opinion on Kelly's sanity. I believe the focus should be that there is no evidence in the record to even suggest that Kelly did not know right from wrong at the time he committed the offense. Accordingly, there was no evidence which required the submission of the defensive issue.