

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-08-023-CR

TIMOTHY DEAN SCOTT                                        APPELLANT
A/K/A MARK ANTHONY SCOTT

V.

THE STATE OF TEXAS                                           STATE

------------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three points, Appellant Timothy Dean Scott appeals his convictions for aggravated assault on a public servant and for resisting arrest. We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

During a September evening in 2006, Hood County Deputy James Yarbrough responded to a domestic violence call. He testified that when he arrived, he "could see a disturbance and assault taking place. It was a male subject, striking a female subject around the face area and upper chest area." The male subject, Scott, had a knife in his hand. The female subject was Alice Sue Schuman, Scott's common law wife. The scene was dark and chaotic, with several children contributing to the chaos by running around and screaming.

Deputy Yarbrough testified that Schuman's demeanor changed when he approached, and she tried to block him from reaching Scott. He pulled Schuman out of the way. Scott started cutting himself with the knife. Deputy Yarbrough instructed Scott to put the knife down, but Scott continued to cut himself. Deputy Yarbrough testified that Scott said he was going to cut him or throw the knife at him and "that he was going to make [Deputy Yarbrough] commit death by cop," i.e., force Deputy Yarbrough to shoot him. He then testified that Scott made two swiping motions towards Deputy Yarbrough's chest, close enough that the knife touched his uniform shirt. Although Deputy Yarbrough drew his gun, he managed to knock the knife out of Scott's hand with his baton.

2

Deputy Yarbrough testified that Scott actively resisted arrest and that it took three officers to put him in handcuffs. The officers took Scott to Lake Granbury Medical Center; he was released that evening and transported to the Hood County Jail. Deputy Yarbrough did not suffer any cut or stab wounds, but he tore ligaments in his right hand that required surgery. A videotape of the incident, taken from Deputy Yarbrough's patrol car, was published to the jury.

Scott pleaded not guilty. A jury convicted him of the two offenses and assessed punishment at thirty-five years' confinement for the aggravated assault charge and twenty-five years' confinement for the resisting arrest charge. This appeal followed.

### III. Discussion

### A. Jury Instruction

In his second point, Scott argues that the trial court erred when it refused to submit a jury instruction on the insanity defense under code of criminal procedure article 46C.151 because he presented some evidence of insanity and properly requested the instruction. Scott claims that the dispositive issue in his case was whether he was aware that his conduct was wrong at the time of the incident that produced the aggravated assault and resisting arrest charges.

**1. Standard of Review**

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2007); *see also Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171.

A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of the strength of the evidence. *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997); *Golden v. State*, 851 S.W.2d 291, 295 (Tex. Crim. App. 1993); *Pennington v. State*, 54 S.W.3d 852, 856 (Tex. App.—Fort Worth 2001, pet. ref'd). The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge. *Brown*, 955 S.W.2d at 279; *Golden,* 851 S.W.2d at 295. We review the evidence in the light most favorable to the defendant to determine whether a defensive

4

issue should have been submitted. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001).

**2. Insanity Defense**

Section 8.01 of the penal code states that it is an affirmative defense to prosecution that, at the time of the charged conduct, the defendant, as a result of severe "mental disease or defect," did not know that his conduct was wrong. *See* Tex. Penal Code Ann. § 8.01(a) (Vernon 2007). Article 46C.151(a) of the code of criminal procedure provides that in a case tried to a jury, the issue of the defendant's sanity shall be submitted to the jury "only if the issue is supported by competent evidence." Tex. Code Crim. Proc. Ann. art. 46C.151(a) (Vernon 2006); *Fuller v. State*, 423 S.W.2d 924, 926 (Tex. Crim. App. 1968). Properly admitted opinion testimony of lay witnesses is sufficient to support a finding of insanity. *Pacheco v. State*, 757 S.W.2d 729, 733, 736 (Tex. Crim. App. 1988). *But see Ross v. State*, 153 Tex. Crim. 312, 327, 220 S.W.2d 137, 146 (1948) (op. on reh'g) ("Nonexpert witnesses are confined to their opinions only at the time of their observations of the accused person.").

A defendant is entitled to an instruction on a defensive issue like insanity if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think

about the credibility of the defense—that is, if evidence from any source raises the issue of insanity, the trial court must include an instruction on this defense in the jury charge. *See Kelly v. State*, 195 S.W.3d 753, 756 (Tex. App.—Waco 2006, pet. ref'd); *see also Gibson v. State*, 726 S.W.2d 129, 132–33 (Tex. Crim. App. 1987) (defensive issues). Although reversal is warranted if the issue is properly raised by competent evidence and the court fails to give the charge upon timely request or objection, if the issue of insanity at the time of the offense is not raised by the evidence, the trial court does not err by failing to instruct the jury upon the law of insanity as a defense. *Fuller*, 423 S.W.2d at 926.

The focus of the insanity defense is upon the accused's mental state at the time of the alleged offense. *Beasley v. State*, 810 S.W.2d 838, 841 (Tex. App.—Fort Worth 1991, pet. ref'd). Furthermore, the existence of a mental disease, alone, is not sufficient to establish legal insanity; rather, the accused must have been mentally ill at the time of the offense to the point that he did not know his conduct was wrong. *Nutter v. State*, 93 S.W.3d 130, 132 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

**3. Analysis**

Scott and his witnesses gave the following testimony:

- According to Scott's younger brother, Scott was not "in his right mind" a few days before the arrest, and he hypothesized that Scott was off of his medication.

- According to David Eugene Allsup, Scott's parole officer, in June 2006, several months before the incident in this case, he was concerned about Scott's ability to understand his rights for a parole hearing because of Scott's withdrawal from his anxiety medicine, Xanax. He testified that Scott was fine ten days later, that Scott was not on the parole mental health caseload, that there was no history of mental illness in Scott's records, and that he did not know if Scott really had mental problems or if he just faked them.

- According to Schuman, Scott was not in his right mind the night of the incident, Scott made bad decisions when not in his right mind, Scott was suicidal, and Scott's mental functioning had been deteriorating over the last month or two.[2]

- According to Scott, he had been diagnosed as paranoid schizophrenic and manic depressive with delusions, he had been on the mental health caseload while in prison, he had been to a mental hospital twice, and a change in his medication caused him to hallucinate. He testified that he did not remember the night of the incident, but that, based on the type

---

[2] Schuman testified that she and Scott had argued but that he did not assault her and she did not assault him. She testified that Scott cut himself that night and said he wanted to kill himself and die, that the couple had "trouble" over the last month or two, and that the police had been called out before. She called 911 three times before that night and had him arrested for assault, although she testified that he never actually assaulted her or attacked anyone in a violent way. She also testified that she usually started the fights and that she had assaulted him on a previous occasion, hitting him with a mop handle and breaking his ribs. Schuman testified that the State tried to threaten or intimidate her with regard to her testimony, including threatening her with jail, and that in exchange for her testimony, the State offered not to file charges against her. She testified that she was telling the truth in spite of the State's threats.

of person he is and his review of the videotape of the incident, he must not have known what he was doing was wrong.[3]

- According to Lieutenant Peter Collie, from the Hood County Jail, Scott asked him to testify that Scott was crazy.

The only person to address whether Scott knew what he was doing was wrong at the time of the offense was Scott himself, in the following testimony during his direct examination:

> Q.  On the night that we're here about today, were you able to formulate whether or not what you were doing was right or wrong?
>
> A.  No. . . . I can't remember what happened.
>
> . . . .
>
> Q.  Could you formulate in your mind the difference between right and wrong on the night that this happened?
>
> A.  I guess not, because I don't remember that night. . . . From looking at the video, I would say I didn't understand what was going on, because all I was — I wasn't trying to hurt anybody but myself.  I mean if — if I were holding a knife and somebody were stabbing me, there's — I couldn't — I couldn't even defend myself with a knife.  There's no way I could stab someone.
>
> . . . .

---

[3] Scott testified that the fights with Schuman made him crazy and that she had assaulted him several times.  He also testified that he never assaulted Schuman, that he was falsely arrested three times, and that he still hears voices but is now able to separate real from unreal.

Q.    When did you lose recollection that night?

A.    There's times when I've lost three or four days. . . . I guess I didn't know what I was doing[.]

. . . .

Q.    Are you better now than you were then?

A.    Yes, sir. I — that medication seemed to straighten me out or — maybe I'm not getting stabbed every weekend and the police called on me and going to work with black eyes or broke ribs or broke fingers, yeah. I'm better.

Q.    But I mean your mental condition, is it better?

A.    Yes, sir. I've — I still hear voices, but I know that they're voices I'm hearing and I — I'm able to — I know that they're — they're not real. I mean I can — I can separate the two now.

. . . .

Q.    Are you cured now?

A.    I don't know. I still hear voices. And I — I'm not stressed out now so I'm not as bad as I was, but what happens if I — a bunch of, you know, I get really stressed out again? I don't know, man. I — what I do know is I've never tried to hurt anybody, and I wasn't trying to hurt anybody but myself.

Q.    And you know that from watching the video.

A.    I know that from who I am by nature. I mean I might have been — I might have been having some mental issues but I don't think I would have gone against my very nature and become violent just because I was sick.

9

On cross-examination, Scott gave the following testimony:

Q.    The reason why your testimony is that you don't think you did it is because you say it's not in your nature.

A.    That's right.

      . . . .

Q.    The idea here, I guess, is that because the police and Ms. Schuman were picking on you, you lost your mind?

A.    Well, no, I wouldn't say that. I had been having some real issues for months before that, but that certainly aggravated the circumstances. I was losing my jobs. I had mortgages to pay. I had new vehicles to pay on. I was going to work with stab wounds, broke ribs, black eyes, broke noses, and I was finding glass pipes under my car seats. She . . . had me illegally jailed for two months, and then when I get out, a 19-year-old kid has been living in my house, driving my truck, and —.

On the record before us, Scott ultimately failed to produce any testimony or other evidence to show that he did not know his conduct was wrong at the time he assaulted Deputy Yarbrough or resisted arrest. Scott's lack of memory of the incident and his opinion that he must not have known what he was doing was wrong, based on his review of the videotape and his opinion of his own character, was not enough to entitle him to an instruction on insanity in the jury charge. *See Nutter*, 93 S.W.3d at 131–32; *see also Pacheco*, 757 S.W.2d at 736 (stating only that predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense *may* be

10

sufficient to raise the issue); *Cato v. State*, 534 S.W.2d 135, 138 (Tex. Crim. App. 1976) (holding that defendant's testimony about having visions a few days prior to the offense and his alleged traumatic amnesia about the facts surrounding the offense did not entitle him to an instruction on insanity); *Kelley*, 195 S.W.3d at 757 (holding that testimony that defendant was not himself during the commission of the offense, that he was acting in a significantly abnormal manner, and that he experienced mental disease or defect afterward was not sufficient to entitle him to an instruction on insanity); *Jeffley v. State*, 938 S.W.2d 514, 515–16 (Tex. App.—Texarkana 1997, no pet.) (holding that testimony about defendant's loss of memory, nervousness, and being upset was insufficient to show insanity). Therefore, we overrule his second point.

**B. Scott's Evidentiary Complaints**

In his first point, Scott complains that the trial court erred when it failed to admit the prior inconsistent statements of one of his witnesses. In his third point, Scott contends that the trial court erred when it allowed the State to impeach one of his witnesses with multiple extraneous, unadjudicated offenses.

**1. Standard of Review**

We review a trial court's decision to admit or to exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A trial court does not abuse its discretion as long as

11

its decision is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g).

### 2. Prior Inconsistent Statements

Scott asserts that the trial court denied him the opportunity to effectively cross-examine his parole officer, Allsup, when it failed to admit Allsup's prior statements from a parole hearing. He argues that Allsup's statements were admissible under a variety of hearsay exceptions, specifically, rules of evidence 613(a), 801(e)(1)(A), and 803(8). *See* Tex. R. Evid. 613(a) (addressing foundation required to use prior inconsistent statements for impeachment); 801(e)(1)(A) (stating that prior inconsistent statements are not hearsay); 803(8) (setting out hearsay exception for public records).

Scott called Allsup as a defense witness. During Allsup's direct testimony, the State objected to many of Scott's questions as leading and also objected on the bases of hearsay, relevance, lack of personal knowledge, and speculation. The trial court sustained most of these objections. Scott requested permission to make a bill of error, which the trial court granted. Scott offered an audiotape from his parole hearing and a synopsis of the testimony at the parole hearing as part of his offer of proof, and the trial court accepted these as Exhibits A and B.

12

The record reflects that the parole hearing was held in August 2006 with regard to an alleged assault on Schuman by Scott in June 2006. The incident leading to the offenses charged in this case occurred in September 2006, after a different alleged assault on Schuman by Scott. The State objected on the basis of relevance to Scott's questions about the parole hearing audiotape, the trial court sustained that objection, Scott did not address relevance in his offer of proof, and Scott does not address that objection here.[4] *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating that the complaint made on appeal must comport with that made in the trial court). Therefore, although Scott argues that Allsup made inconsistent statements about Scott's mental state at the parole hearing "just after [Scott's] arrest" on the charges in this case, such that he should have been allowed to impeach Allsup with those statements, this argument fails on the timeline presented by the record before us and on the actual objection made by the State and sustained by the trial court.

---

[4] The State objected on the basis of relevance to Scott's initial question to Allsup about whether the tape fairly and accurately represented the parole hearing testimony. After the trial court sustained the objection, Scott responded by stating, "I haven't offered it. I was just asking if it was — if it was accurate."

Furthermore, a prior inconsistent statement is a statement "inconsistent with the declarant's testimony," given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding. Tex. R. Evid. 801(e)(1)(A). Although Scott argues the applicability of hearsay exceptions based on prior inconsistent statements for Allsup's statements at the parole hearing about Scott's mental state, there is very little, if anything, that is inconsistent between the testimony that Allsup gave at trial and Allsup's statements during the parole hearing. Allsup's unobjected-to direct testimony at trial proceeded as follows:

> Q. What — what business, besides just regular visits . . . did you have with [Scott]?
>
> A. In like June of 2006, there was an assault charge that was brought about and we went through the process of — of a hearing process.
>
> Q. That's right. And that hearing process involved you talking to him and taking testimony, is that right?
>
> A. That's correct.
>
> Q. And did you have to delay that process for any reason?
>
> A. I did.
>
> Q. Why did you delay that process?
>
> A. When I initially went to interview him, I was told that he was having withdrawals from Xanax, and I didn't feel comfortable with him understanding the — his rights before we proceeded

14

with the hearing process, so I went back and talked to my supervisor and we delayed it.

Q. And you had spoken with him?

A. At that time?

Q. Yes.

A. I can't recall if he responded to me or if I spoke to him. It's been a year and a half.

Q. Right. But you saw him and — and you saw his present state, is that right?

A. I did.

Q. And that was back before this incident that we're here about today?

A. Yes, sir.

Q. And that state was not good, right?

A. I — he just wouldn't respond to me at that time.

Q. Did he seem to have a mental awareness of what was going on and sufficient to — to know the difference between right and wrong?

A. I'm not a doctor. I can't gauge that. Alls [sic] I know is that he wouldn't respond to me, and I didn't feel comfortable with him signing the documents that would allow us to proceed on with a hearing at that time.

. . . .

Q. You didn't think he was just being belligerent, did you?

15

A. No, he wasn't belligerent. He just wouldn't respond to me. As I recall, he was basically just in a separate cell, and he was — he would just stare at the wall, he wouldn't like look directly at me when I asked him a question, or if he understood his rights, if I started to read, you know. Like I said, I just didn't feel comfortable proceeding on from there.

Q. After all that, did you see his condition improve?

A. I went back and interviewed him about ten days later, and we proceeded on with the hearing process, and I didn't have any other problems or issues with him.

On redirect, in response to Scott's question regarding whether, at the time Allsup interviewed Scott, he had an opinion "as to whether [Scott] was right or wrong," Allsup testified, "I had no opinion one way or the other. Alls [sic] I felt like it was that at that time he didn't — he would not have understood his rights, and I just didn't feel right going ahead with the hearing process."

Allsup's testimony in Scott's bill of error pertained to what Schuman testified about at the parole hearing, i.e., that Scott did not actually assault her, and to what Allsup said at the hearing about Scott's mental state:

Q. And also in that hearing and on that tape, you — you said that you had to hold off on this hearing because you were concerned that he was incompetent to go to a hearing.

A. I believe my words were that he was suffering from Xanax withdrawal, is what I was stating, and I stated that he wasn't in the right frame of mind at that time or I felt, in my opinion, to sign the documents.

16

In the synopsis of the parole hearing, Allsup's testimony is not substantially different from that at trial:

> On 6/19/06, the OFFENDER [Scott] and SCHUMAN had an argument and the OFFENDER was alleged to have pushed SCHUMAN down. The Hood County Sheriff's Department was called and before their arrival, the OFFENDER had left the residence. Office[r]s talked with SCHUMAN and gave her information regarding family violence. Thirty minutes later, the OFFENDER returned and again the police were called to the residence. The OFFENDER was arrested for Assault-Family Violence. There were no injuries to SCHUMAN noted in the offense report. When he spoke to the OFFENDER, the OFFENDER denied the allegation. ALLSUP stated that he was aware that the charge had been returned on 07/10/06. He attempted to interview the OFFENDER after that time, but the OFFENDER informed him he was having a withdrawal from Xanex. ALLSUP stated he did not feel that the OFFENDER was in the right frame of mind to sign any documents and he let it sit until the OFFENDER was in a better frame of mind.[5]

Because Scott failed to respond to the State's relevance objection and because there is nothing in the record to show that Allsup actually made any prior inconsistent statements to which Scott's hearsay exceptions would apply, we cannot say that the trial court abused its discretion by not allowing Scott

---

[5] The parole hearing audiotape reveals only that Allsup informed the hearing officer that during Scott's withdrawal from Xanax, Allsup did not feel that Scott was in the right frame of mind to make decisions or sign legal documents, and Scott himself informed the hearing officer that he had a prescription for Xanax and stated that the anxiety disorder was his only problem.

to impeach Allsup with his statements from the parole hearing.  Therefore, we overrule Scott's first point.

### 3. Impeachment

Scott additionally contends that the State improperly impeached his most critical witness, Schuman, when it questioned her about multiple extraneous, unadjudicated criminal acts in violation of rules of evidence 608(a) and (b) and 609(f).  *See* Tex. R. Evid. 608 (addressing when and how a witness's credibility may be attacked); 609(f) (stating that evidence of a conviction is not admissible without advance notice).

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.  Tex. R. App. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).

To preserve error, a party must continue to object each time the objectionable evidence is offered.  *Fuentes v. State*, 991 S.W.2d 267, 273

18

(Tex. Crim. App.), *cert. denied,* 528 U.S. 1026 (1999); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991). A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Johnson v. State*, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991). And an objection preserves only the specific ground cited. Tex. R. App. P. 33.1(a)(1)(A); *Mosley*, 983 S.W.2d at 265; *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 827 (1997).

Although Scott complains that he objected to the State's questioning of Schuman about whether she had a pending felony case for credit card abuse and fraudulent use of identifying information, the record reflects that he only objected to these questions on the basis of relevance and not with regard to improper character evidence. During cross-examination, the State asked the following questions to Schuman:

Q. How were you employed?

A. I mean I was employed as a CNA.

Q. What is that?

19

A. A Certified Nurse's aid.

Q. You're no longer employed in that capacity, are you?

A. No.

Q. In fact, you were fired.

A. No, I was not.

[Defense]: Objection, relevance.

[Trial] Court: Sustained.

Q. In fact, you have a pending felony case —

[Defense]: Objection, relevance.

[State]: It goes to —.

[Trial] Court: Overruled.

A. I — you know what? I don't know nothing about that because for some reason nobody will tell me about that. And no, I wasn't.

Q. Do you know whether or not you have a pending felony case for credit card abuse or fraudulent use of the identifying information of the elderly people you were working for?

A. Those charges didn't come up until the day after you told me I would be arrested for not bringing my daughter, because —

Q. I didn't ask you that.

A. — my bondsman called that day and there was no warrant.

Q. My question to you, do you know or do you not know you have those charges pending?

20

A.    I don't know nothing about them charges.  I have pending charges that nobody will tell me anything about.

Q.    All right.  But getting back to —

A.    Felony charges —

Q.    — this, —

A.    — that weren't there Monday.

Q.    — You were — when were you fired?  Or when were you not working anymore?

A.    What do you mean when I wasn't working?

Q.    Never mind.

A.    After you threatened to have me thrown in jail.

Thus, Scott's only objection was on the basis of relevance.

With regard to the other instances that Scott complains about, one occurred during Scott's redirect examination of Schuman, in which *Scott*, and *not* the State, asked Schuman if she had been "offered anything in exchange for testifying the way the State wants [her] to testify."  And Scott failed to object at all to the State's questions and Schuman's testimony on recross-examination with regard to a pending misdemeanor marijuana charge.

21

Consequently, Scott failed to preserve error on any of the subpoints within his third point.  Therefore, we overrule his third point.[6]

## IV. Conclusion

Having overruled Scott's three points, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY and GARDNER, JJ.; and DIXON W. HOLMAN, J. (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 8, 2009

---

[6] In a supplemental motion to file a supplemental brief, filed by Scott himself after the briefs in this case had already been submitted, Scott sought permission to raise the issue of ineffective assistance of counsel at trial. Although we denied that motion, we note that recourse is still available to Scott in the form of resubmitting this claim in an application for a post-conviction writ of habeas corpus.  *See* Tex. Code Crim. Proc. Ann. art. 11.07 (Vernon Supp. 2008).  That forum would provide an opportunity to conduct a hearing to consider the facts, circumstances, and rationale for counsel's actions and inactions.  *See Thompson v. State*, 9 S.W.3d 808, 813–15 (Tex. Crim. App. 1999); *Ramos v. State*, 45 S.W.3d 305, 312 n.1 (Tex. App.—Fort Worth 2001, pet. ref'd).

22