COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                       NO.
02-08-023-CR

 

 

TIMOTHY DEAN SCOTT                                                       APPELLANT

A/K/A MARK ANTHONY SCOTT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction

In three points, Appellant Timothy Dean Scott
appeals his convictions for aggravated assault on a public servant and for
resisting arrest.  We affirm.

 

 








II. Factual and Procedural Background

During a September evening in 2006, Hood County
Deputy James Yarbrough responded to a domestic violence call.  He testified that when he arrived, he Acould
see a disturbance and assault taking place. 
It was a male subject, striking a female subject around the face area
and upper chest area.@ The male subject, Scott, had a
knife in his hand.  The female subject
was Alice Sue Schuman, Scott=s common
law wife.  The scene was dark and
chaotic, with several children contributing to the chaos by running around and
screaming. 

Deputy Yarbrough testified that Schuman=s
demeanor changed when he approached, and she tried to block him from reaching
Scott.  He pulled Schuman out of the
way.  Scott started cutting himself with
the knife.  Deputy Yarbrough instructed
Scott to put the knife down, but Scott continued to cut himself.  Deputy Yarbrough testified that Scott said he
was going to cut him or throw the knife at him and Athat he
was going to make [Deputy Yarbrough] commit death by cop,@ i.e., force
Deputy Yarbrough to shoot him.  He then
testified that Scott made two swiping motions towards Deputy Yarbrough=s chest,
close enough that the knife touched his uniform shirt.  Although Deputy Yarbrough drew his gun, he
managed to knock the knife out of Scott=s hand
with his baton.








Deputy Yarbrough testified that Scott actively
resisted arrest and that it took three officers to put him in handcuffs.  The officers took Scott to Lake Granbury
Medical Center; he was released that evening and transported to the Hood County
Jail.  Deputy Yarbrough did not suffer
any cut or stab wounds, but he tore ligaments in his right hand that required
surgery.  A videotape of the incident,
taken from Deputy Yarbrough=s patrol
car, was published to the jury.

Scott pleaded not guilty.  A jury convicted him of the two offenses and
assessed punishment at thirty‑five years=
confinement for the aggravated assault charge and twenty‑five years=
confinement for the resisting arrest charge. 
This appeal followed.

III. Discussion

A. Jury Instruction

In his second point, Scott argues that the trial
court erred when it refused to submit a jury instruction on the insanity
defense under code of criminal procedure article 46C.151 because he presented
some evidence of insanity and properly requested the instruction.  Scott claims that the dispositive issue in
his case was whether he was aware that his conduct was wrong at the time of the
incident that produced the aggravated assault and resisting arrest charges.








1. Standard of Review

Appellate review of error in a jury charge involves
a two-step process.  Abdnor v. State,
871 S.W.2d 726, 731 (Tex. Crim. App. 1994). 
Initially, we must determine whether error occurred.  If so, we must then evaluate whether
sufficient harm resulted from the error to require reversal.  Id. at 731B32.  Error in the charge, if timely objected to in
the trial court, requires reversal if the error was Acalculated
to injure the rights of [the] defendant,@ which
means no more than that there must be some harm to the accused from the
error.  Tex. Code Crim. Proc. Ann. art.
36.19 (Vernon 2007); see also Abdnor, 871 S.W.2d at 731B32; Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh=g).  In other words, a properly preserved error
will require reversal as long as the error is not harmless.  Almanza, 686 S.W.2d at 171. 








A defendant is entitled to an affirmative
defensive instruction on every issue raised by the evidence regardless of the
strength of the evidence.  Brown v.
State, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997); Golden v. State,
851 S.W.2d 291, 295 (Tex. Crim. App. 1993); Pennington v. State, 54
S.W.3d 852, 856 (Tex. App.CFort
Worth 2001, pet. ref=d).  The defendant=s
testimony alone may be sufficient to raise a defensive theory requiring a
charge.  Brown, 955 S.W.2d at 279;
Golden, 851 S.W.2d at 295.  We
review the evidence in the light most favorable to the defendant to determine
whether a defensive issue should have been submitted.  Ferrel v. State, 55 S.W.3d 586, 591
(Tex. Crim. App. 2001).

2. Insanity Defense

Section 8.01 of the penal code states that it is
an affirmative defense to prosecution that, at the time of the charged conduct,
the defendant, as a result of severe Amental
disease or defect,@ did not know that his conduct
was wrong.  See Tex. Penal Code
Ann. ' 8.01(a)
(Vernon 2007).  Article 46C.151(a) of the
code of criminal procedure provides that in a case tried to a jury, the issue
of the defendant=s sanity shall be submitted to
the jury Aonly if the issue is supported
by competent evidence.@ 
Tex. Code Crim. Proc. Ann. art. 46C.151(a) (Vernon 2006); Fuller v.
State, 423 S.W.2d 924, 926 (Tex. Crim. App. 1968).  Properly admitted opinion testimony of lay
witnesses is sufficient to support a finding of insanity.  Pacheco v. State, 757 S.W.2d 729, 733,
736 (Tex. Crim. App. 1988).  But see
Ross v. State, 153 Tex. Crim. 312, 327, 220 S.W.2d 137, 146 (1948) (op. on
reh=g) (ANonexpert
witnesses are confined to their opinions only at the time of their observations
of the accused person.@).








A defendant is entitled to an instruction on a
defensive issue like insanity if the issue is raised by the evidence, whether
that evidence is strong or weak, unimpeached or contradicted, and regardless of
what the trial court may think about the credibility of the defenseCthat is,
if evidence from any source raises the issue of insanity, the trial court must
include an instruction on this defense in the jury charge.  See Kelly v. State, 195 S.W.3d 753,
756 (Tex. App.CWaco 2006, pet. ref=d); see
also Gibson v. State, 726 S.W.2d 129, 132B33 (Tex.
Crim. App. 1987) (defensive issues). Although reversal is warranted if the
issue is properly raised by competent evidence and the court fails to give the
charge upon timely request or objection, if the issue of insanity at the time
of the offense is not raised by the evidence, the trial court does not err by
failing to instruct the jury upon the law of insanity as a defense.  Fuller, 423 S.W.2d at 926.

The focus of the insanity defense is upon the
accused=s mental
state at the time of the alleged offense. 
Beasley v. State, 810 S.W.2d 838, 841 (Tex. App.CFort
Worth 1991, pet. ref=d).  Furthermore, the existence of a mental
disease, alone, is not sufficient to establish legal insanity;  rather, the accused must have been mentally
ill at the time of the offense to the point that he did not know his conduct
was wrong.  Nutter v. State, 93
S.W.3d 130, 132 (Tex. App.CHouston
[14th Dist.] 2001, no pet.). 

3. Analysis

Scott and his witnesses gave the following
testimony:








$                  
According to Scott=s younger brother, Scott was not Ain his right mind@ a few days before the
arrest, and he hypothesized that Scott was off of his medication.

 

$                  
According to David Eugene Allsup, Scott=s parole officer, in June
2006, several months before the incident in this case, he was concerned about
Scott=s ability to understand
his rights for a parole hearing because of Scott=s withdrawal from his
anxiety medicine, Xanax.  He testified
that Scott was fine ten days later, that Scott was not on the parole mental
health caseload, that there was no history of mental illness in Scott=s records, and that he
did not know if Scott really had mental problems or if he just faked them. 

 

$                  
According to Schuman, Scott was not in his right mind the night of the
incident, Scott made bad decisions when not in his right mind, Scott was
suicidal, and Scott=s mental functioning had
been deteriorating over the last month or two.[2]

 








$                  
According to Scott, he had been diagnosed as paranoid schizophrenic
and manic depressive with delusions, he had been on the mental health caseload
while in prison, he had been to a mental hospital twice, and a change in his
medication caused him to hallucinate.  He
testified that he did not remember the night of the incident, but that, based
on the type of person he is and his review of the videotape of the incident, he
must not have known what he was doing was wrong.[3]      

 

$                  
According to Lieutenant Peter Collie, from the Hood County Jail, Scott
asked him to testify that Scott was crazy.

 

The only person to address whether Scott knew
what he was doing was wrong at the time of the offense was Scott himself, in
the following testimony during his direct examination:

Q.     On
the night that we=re here about today, were
you able to formulate whether or not what you were doing was right or wrong?

 

A.     No. .
. . I can=t remember what happened.


 

. . . .

 

Q.     Could
you formulate in your mind the difference between right and wrong on the night
that this happened?

 

A.     I guess not, because I don=t
remember that night. . . . From looking at the video, I would say I didn=t
understand what was going on, because all I was C I wasn=t trying
to hurt anybody but myself.  I mean if C if I
were holding a knife and somebody were stabbing me, there=s C I
couldn=t C I
couldn=t even
defend myself with a knife.  There=s no way
I could stab someone.

. . . .








Q.     When did you lose recollection that night?

A.     There=s times when I=ve lost three or four
days. . . . I guess I didn=t know what I was doing[.]

 

. . . . 

 

Q.     Are
you better now than you were then?

 

A.     Yes,
sir.  I C that medication seemed
to straighten me out or C maybe I=m not getting stabbed
every weekend and the police called on me and going to work with black eyes or
broke ribs or broke fingers, yeah.  I=m better.

 

Q.     But I
mean your mental condition, is it better?

 

A.     Yes,
sir.  I=ve C I still hear voices, but
I know that they=re voices I=m hearing and I C I=m able to C I know that they=re C they=re not real.  I mean I can C I can separate the two
now.

 

. . . . 

 

Q.     Are
you cured now?

 

A.     I don=t know.  I still hear voices.  And I C I=m not stressed out now so I=m not as bad as I was,
but what happens if I C a bunch of, you know, I
get really stressed out again?  I don=t know, man.  I C what I do know is I=ve never tried to hurt
anybody, and I wasn=t trying to hurt anybody
but myself.

 

Q.     And
you know that from watching the video.

 

A.     I
know that from who I am by nature.  I
mean I might have been C I might have been having
some mental issues but I don=t think I would have gone against my very nature
and become violent just because I was sick.

 








On cross-examination, Scott gave the following
testimony:

Q.     The
reason why your testimony is that you don=t think you did it is because you say it=s not in your nature.

 

A.     That=s right.

 

. . . .

 

Q.     The
idea here, I guess, is that because the police and Ms. Schuman were picking on
you, you lost your mind?

 

A.     Well, no, I wouldn=t say
that.  I had been having some real issues
for months before that, but that certainly aggravated the circumstances.  I was losing my jobs.  I had mortgages to pay.  I had new vehicles to pay on.  I was going to work with stab wounds, broke
ribs, black eyes, broke noses, and I was finding glass pipes under my car
seats.  She . . . had me illegally jailed
for two months, and then when I get out, a 19-year-old kid has been living in
my house, driving my truck, and C.








On the record before us, Scott ultimately failed
to produce any testimony or other evidence to show that he did not know his
conduct was wrong at the time he assaulted Deputy Yarbrough or resisted
arrest.  Scott=s lack
of memory of the incident and his opinion that he must not have known what he
was doing was wrong, based on his review of the videotape and his opinion of
his own character, was not enough to entitle him to an instruction on insanity
in the jury charge.  See Nutter,
93 S.W.3d at 131B32; see also Pacheco, 757
S.W.2d at 736 (stating only that predicated lay opinion testimony when
considered with facts and circumstances concerning an accused and of the
offense may be sufficient to raise the issue); Cato v. State, 534
S.W.2d 135, 138 (Tex. Crim. App. 1976) (holding that defendant=s
testimony about having visions a few days prior to the offense and his alleged
traumatic amnesia about the facts surrounding the offense did not entitle him
to an instruction on insanity); Kelley, 195 S.W.3d at 757 (holding that
testimony that defendant was not himself during the commission of the offense,
that he was acting in a significantly abnormal manner, and that he experienced
mental disease or defect afterward was not sufficient to entitle him to an
instruction on insanity); Jeffley v. State, 938 S.W.2d 514, 515B16 (Tex.
App.CTexarkana
1997, no pet.) (holding that testimony about defendant=s loss
of memory, nervousness, and being upset was insufficient to show
insanity).  Therefore, we overrule his
second point.

B. Scott=s Evidentiary Complaints

In his first point, Scott complains that the
trial court erred when it failed to admit the prior inconsistent statements of
one of his witnesses.  In his third
point, Scott contends that the trial court erred when it allowed the State to
impeach one of his witnesses with multiple extraneous, unadjudicated offenses.

1. Standard of Review








We review a trial court=s
decision to admit or to exclude evidence under an abuse of discretion
standard.  Weatherred v. State, 15
S.W.3d 540, 542 (Tex. Crim. App. 2000). 
A trial court does not abuse its discretion as long as its decision is
within the zone of reasonable disagreement. 
Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)
(op. on reh=g).  

2. Prior Inconsistent Statements

Scott asserts that the trial court denied him the
opportunity to effectively cross-examine his parole officer, Allsup, when it
failed to admit Allsup=s prior statements from a parole
hearing.  He argues that Allsup=s
statements were admissible under a variety of hearsay exceptions, specifically,
rules of evidence 613(a), 801(e)(1)(A), and 803(8).  See Tex. R. Evid. 613(a) (addressing
foundation required to use prior inconsistent statements for impeachment);
801(e)(1)(A) (stating that prior inconsistent statements are not hearsay);
803(8) (setting out hearsay exception for public records).

Scott called Allsup as a defense witness.  During Allsup=s direct
testimony, the State objected to many of Scott=s
questions as leading and also objected on the bases of hearsay, relevance, lack
of personal knowledge, and speculation. 
The trial court sustained most of these objections.  Scott requested permission to make a bill of
error, which the trial court granted. 
Scott offered an audiotape from his parole hearing and a synopsis of the
testimony at the parole hearing as part of his offer of proof, and the trial
court accepted these as Exhibits A and B.








The record reflects that the parole hearing was
held in August 2006 with regard to an alleged assault on Schuman by Scott in
June 2006.  The incident leading to the
offenses charged in this case occurred in September 2006, after a different
alleged assault on Schuman by Scott.  The
State objected on the basis of relevance to Scott=s
questions about the parole hearing audiotape, the trial court sustained that
objection, Scott did not address relevance in his offer of proof, and Scott
does not address that objection here.[4]  See Heidelberg v. State, 144
S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating that the complaint made on
appeal must comport with that made in the trial court).  Therefore, although Scott argues that Allsup
made inconsistent statements about Scott=s mental
state at the parole hearing Ajust
after [Scott=s] arrest@ on the
charges in this case, such that he should have been allowed to impeach Allsup
with those statements, this argument fails on the timeline presented by the
record before us and on the actual objection made by the State and sustained by
the trial court. 








Furthermore, a prior inconsistent statement is a
statement Ainconsistent with the declarant=s
testimony,@ given under oath subject to the
penalty of perjury at a trial, hearing, or other proceeding.  Tex. R. Evid. 801(e)(1)(A).  Although Scott argues the applicability of
hearsay exceptions based on prior inconsistent statements for Allsup=s
statements at the parole hearing about Scott=s mental
state, there is very little, if anything, that is inconsistent between the
testimony that Allsup gave at trial and Allsup=s
statements during the parole hearing. 
Allsup=s unobjected-to direct testimony
at trial proceeded as follows:

Q.     What C what business, besides
just regular visits . . . did you have with [Scott]?

 

A.     In
like June of 2006, there was an assault charge that was brought about and we
went through the process of C of a hearing process.

 

Q.     That=s right.  And that hearing process involved you talking
to him and taking testimony, is that right?

 

A.     That=s correct.

 

Q.     And
did you have to delay that process for any reason?

 

A.     I
did.

 

Q.     Why
did you delay that process?

 








A.     When
I initially went to interview him, I was told that he was having withdrawals
from Xanax, and I didn=t feel comfortable with
him understanding the C his rights before we
proceeded with the hearing process, so I went back and talked to my supervisor
and we delayed it.

 

Q.     And
you had spoken with him?

 

A.     At
that time?

 

Q.     Yes.

 

A.     I can=t recall if he responded
to me or if I spoke to him.  It=s been a year and a half.

 

Q.     Right.  But you saw him and C and you saw his present
state, is that right?  

 

A.     I
did.

 

Q.     And
that was back before this incident that we=re here about today?

 

A.     Yes,
sir.

 

Q.     And
that state was not good, right?

 

A.     I C he just wouldn=t respond to me at that
time.

 

Q.     Did
he seem to have a mental awareness of what was going on and sufficient to C to know the difference
between right and wrong?

 

A.     I=m not a doctor.  I can=t gauge that. 
Alls [sic] I know is that he wouldn=t respond to me, and I didn=t feel comfortable with
him signing the documents that would allow us to proceed on with a hearing at
that time.

 

. . . .

 

Q.     You
didn=t think he was just being
belligerent, did you?

 








A.     No,
he wasn=t belligerent.  He just wouldn=t respond to me.  As I recall, he was basically just in a
separate cell, and he was C he would just stare at the wall, he wouldn=t like look directly at
me when I asked him a question, or if he understood his rights, if I started to
read, you know.  Like I said, I just didn=t feel comfortable
proceeding on from there.

 

Q.     After
all that, did you see his condition improve?

 

A.     I went back and interviewed him about ten
days later, and we proceeded on with the hearing process, and I didn=t have
any other problems or issues with him.

On redirect, in response to Scott=s
question regarding whether, at the time Allsup interviewed Scott, he had an
opinion Aas to
whether [Scott] was right or wrong,@ Allsup
testified, AI had no opinion one way or the
other.  Alls [sic] I felt like it was
that at that time he didn=t C he
would not have understood his rights, and I just didn=t feel
right going ahead with the hearing process.@

Allsup=s
testimony in Scott=s bill of error pertained to
what Schuman testified about at the parole hearing, i.e., that Scott did not
actually assault her, and to what Allsup said at the hearing about Scott=s mental
state:

Q.     And
also in that hearing and on that tape, you C you said that you had to hold off on this
hearing because you were concerned that he was incompetent to go to a hearing.

 

A.     I believe my words were that he was
suffering from Xanax withdrawal, is what I was stating, and I stated that he
wasn=t in the
right frame of mind at that time or I felt, in my opinion, to sign the
documents.








In the synopsis of the parole hearing, Allsup=s
testimony is not substantially different from that at trial:

On 6/19/06, the OFFENDER [Scott] and SCHUMAN had
an argument and the OFFENDER was alleged to have pushed SCHUMAN down.  The Hood County Sheriff=s
Department was called and before their arrival, the OFFENDER had left the
residence.  Office[r]s talked with
SCHUMAN and gave her information regarding family violence.  Thirty minutes later, the OFFENDER returned
and again the police were called to the residence.  The OFFENDER was arrested for Assault-Family
Violence.  There were no injuries to
SCHUMAN noted in the offense report. 
When he spoke to the OFFENDER, the OFFENDER denied the allegation.  ALLSUP stated that he was aware that the
charge had been returned on 07/10/06.  He
attempted to interview the OFFENDER after that time, but the OFFENDER informed
him he was having a withdrawal from Xanex. 
ALLSUP stated he did not feel that the OFFENDER was in the right frame
of mind to sign any documents and he let it sit until the OFFENDER was in a
better frame of mind.[5]








Because Scott failed to respond to the State=s
relevance objection and because there is nothing in the record to show that
Allsup actually made any prior inconsistent statements to which Scott=s
hearsay exceptions would apply, we cannot say that the trial court abused its
discretion by not allowing Scott to impeach Allsup with his statements from the
parole hearing.  Therefore, we overrule
Scott=s first
point.

3. Impeachment

Scott additionally contends that the State
improperly impeached his most critical witness, Schuman, when it questioned her
about multiple extraneous, unadjudicated criminal acts in violation of rules of
evidence 608(a) and (b) and 609(f).  See
Tex. R. Evid. 608 (addressing when and how a witness=s
credibility may be attacked); 609(f) (stating that evidence of a conviction is
not admissible without advance notice).

To preserve a complaint for our review, a party
must have presented to the trial court a timely request, objection, or motion
that states the specific grounds for the desired ruling if they are not
apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); Mosley v. State, 983 S.W.2d 249, 265
(Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999). 
Further, the trial court must have ruled on the request, objection, or
motion, either expressly or implicitly, or the complaining party must have
objected to the trial court=s
refusal to rule.  Tex. R. App. P.
33.1(a)(2); Mendez v. State, 138 S.W.3d 334, 341 (Tex. Crim. App.
2004).  








To preserve error, a party must continue to
object each time the objectionable evidence is offered.  Fuentes v. State, 991 S.W.2d 267, 273
(Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999); Ethington v.
State, 819 S.W.2d 854, 858B59 (Tex.
Crim. App. 1991).  A trial court=s
erroneous admission of evidence will not require reversal when other such
evidence was received without objection, either before or after the
complained-of ruling.  Leday v. State,
983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson v. State, 803
S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259
(1991), overruled on other grounds by Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991).  And an objection
preserves only the specific ground cited. 
Tex. R. App. P. 33.1(a)(1)(A); Mosley, 983 S.W.2d at 265; Bell
v. State, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996), cert. denied,
522 U.S. 827 (1997).

Although Scott complains that he objected to the
State=s
questioning of Schuman about whether she had a pending felony case for credit
card abuse  and fraudulent use of
identifying information, the record reflects that he only objected to these
questions on the basis of relevance and not with regard to improper character
evidence.  During cross-examination, the
State asked the following questions to Schuman:

Q.     How
were you employed?

 

A.     I
mean I was employed as a CNA.

 

Q.     What
is that?








A.     A
Certified Nurse=s aid.

 

Q.     You=re no longer employed in
that capacity, are you?

 

A.     No.

 

Q.     In
fact, you were fired.

 

A.     No, I
was not.

 

[Defense]: Objection,
relevance.

 

[Trial] Court: Sustained.

 

Q.     In
fact, you have a pending felony case C

 

[Defense]: Objection,
relevance.

 

[State]: It goes to C.

 

[Trial] Court: Overruled.

 

A.     I C you know what?  I don=t know nothing about that because for some reason
nobody will tell me about that.  And no,
I wasn=t.

 

Q.     Do
you know whether or not you have a pending felony case for credit card abuse or
fraudulent use of the identifying information of the elderly people you were
working for?

 

A.     Those
charges didn=t come up until the day
after you told me I would be arrested for not bringing my daughter, because C

 

Q.     I
didn=t ask you that.

 

A.     C my bondsman called that
day and there was no warrant.

 

Q.     My
question to you, do you know or do you not know you have those charges pending?








A.     I don=t know nothing about them
charges.  I have pending charges that
nobody will tell me anything about.

 

Q.     All
right.  But getting back to C

 

A.     Felony
charges C

 

Q.     C this, C 

 

A.     C that weren=t there Monday.

 

Q.     C You were C when were you fired?  Or when were you not working anymore?

 

A.     What
do you mean when I wasn=t working?

 

Q.     Never
mind.

 

A.     After you threatened to have me thrown in
jail.

Thus, Scott=s only objection was on the
basis of relevance.








With regard to the other instances that Scott
complains about, one occurred during Scott=s
redirect examination of Schuman, in which Scott, and not the State,
asked Schuman if she had been Aoffered
anything in exchange for testifying the way the State wants [her] to testify.@  And Scott failed to object at all to the
State=s
questions and Schuman=s testimony on
recross-examination with regard to a pending misdemeanor marijuana charge.
Consequently, Scott failed to preserve error on any of the subpoints within his
third point.  Therefore, we overrule his
third point.[6]

IV. Conclusion

Having
overruled Scott=s three points, we affirm
the trial court=s judgment.

 

PER
CURIAM

 

PANEL: MCCOY and GARDNER,
JJ.; and DIXON W. HOLMAN, J. (Senior Justice, Retired, Sitting by Assignment).

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: January 8,
2009











[1]See Tex. R. App. P. 47.4.





[2]Schuman testified that
she and Scott had argued but that he did not assault her and she did not
assault him.  She testified that Scott
cut himself that night and said he wanted to kill himself and die, that the
couple had Atrouble@ over the last month or
two, and that the police had been called out before.  She called 911 three times before that night
and had him arrested for assault, although she testified that he never actually
assaulted her or attacked anyone in a violent way.  She also testified that she usually started
the fights and that she had assaulted him on a previous occasion, hitting him
with a mop handle and breaking his ribs. 
Schuman testified that the State tried to threaten or intimidate her
with regard to her testimony, including threatening her with jail, and that in
exchange for her testimony, the State offered not to file charges against
her.  She testified that she was telling
the truth in spite of the State=s threats.





[3]Scott testified that the
fights with Schuman made him crazy and that she had assaulted him several
times.  He also testified that he never
assaulted Schuman, that he was falsely arrested three times, and that he still
hears voices but is now able to separate real from unreal.





[4]The State objected on the
basis of relevance to Scott=s initial question to Allsup about whether the
tape fairly and accurately represented the parole hearing testimony.  After the trial court sustained the
objection, Scott responded by stating, AI haven=t offered it. 
I was just asking if it was C if it was accurate.@





[5]The parole hearing
audiotape reveals only that Allsup informed the hearing officer that during
Scott=s withdrawal from Xanax,
Allsup did not feel that Scott was in the right frame of mind to make decisions
or sign legal documents, and Scott himself informed the hearing officer that he
had a prescription for Xanax and stated that the anxiety disorder was his only
problem.





[6]In a supplemental motion
to file a supplemental brief, filed by Scott himself after the briefs in this
case had already been submitted, Scott sought permission to raise the issue of
ineffective assistance of counsel at trial. 
Although we denied that motion, we note that recourse is still available
to Scott in the form of resubmitting this claim in an application for a
post-conviction writ of habeas corpus.  See
Tex. Code Crim. Proc. Ann. art. 11.07 (Vernon Supp. 2008).  That forum would provide an opportunity to
conduct a hearing to consider the facts, circumstances, and rationale for
counsel=s actions and
inactions.  See Thompson v. State,
9 S.W.3d 808, 813B15 (Tex. Crim. App.
1999); Ramos v. State, 45 S.W.3d 305, 312 n.1 (Tex. App.CFort Worth 2001, pet. ref=d).